181 So.2d 524 (1965)
James HARTNETT and Blanche Hartnett, Petitioners,
v.
SOUTHERN INSURANCE COMPANY, Respondent.
No. 34248.
Supreme Court of Florida.
December 15, 1965.
*525 Ernest Ridarsick, Miami, and Broad & Cassel, Miami Beach, for petitioners.
Dean, Adams & Fischer, Miami, for respondent.
DREW, Justice.
After finding that the insured paid premiums for coverage under Coverage "A" of his policy of insurance on his automobile, reading as follows:
"Coverage A  Comprehensive Loss of or Damage to the Automobile, Except by Collision or Upset: To pay for direct and accidental loss of or damage to the automobile, hereinafter called loss, except loss caused by collision of the automobile with another object or by upset of the automobile or by collision of the automobile with a vehicle to which it is attached. Breakage of glass and loss caused by missiles, falling objects, fire, theft, explosion, earthquake, windstorm, hail, water, flood, malicious mischief or vandalism, riot or civil commotion shall not be deemed loss by collision or upset."
but did not pay for premiums for Coverage "D" thereof, reading as follows:
"Coverage D  Theft (Broad Form): To pay for loss of or damage to the automobile, hereinafter called loss, caused by theft, larceny, robbery or pilferage."
the District Court of Appeal, Third District, held[1] that "* * * from the face of the policy of insurance, it affirmatively appears that the appellant did not purchase or pay premiums for such coverage [theft]." Such holding is in direct conflict with Firemans Fund Insurace Co. of San Francisco v. Boyd, 45 So.2d 499, where this Court, at page 501, said:
"`* * * In our opinion, where the word "theft" is used in an insurance policy, without definition, it should be interpreted as liberally as possible to protect the insured.'
"This court is committed to the rule that a contract of insurance prepared and phrased by the insurer is to be construed liberally in favor of the insured and strictly against the insurer, where the meaning of the language used is doubtful, uncertain or ambiguous."
*526 The first page of the policy of insurance out of which this suit arises[2] reads as follows:

*527 
*528 Elemental principles in construing these contracts  summarized in the quotation from the Boyd case supra  require a conclusion that theft is included in the coverage. How there could be any doubt of this in view of the plain language showing a premium charge of $35.00 for a three year coverage for "A  Comprehensive  Loss of or damage to the automobile, except by collision or upset but including fire, theft and windstorm" escapes us. Moreover, if it were necessary to go further, and read more than the small print, we find the largest print on the page contains the admonition: "This policy does not provide * * * any other coverage for which a specific charge is not made * * *."  which is another way of saying that coverage is provided for all items for which a premium is paid.
There is no reason why such policies cannot be phrased so that the average person can clearly understand what he is buying. And so long as these contracts are drawn in such a manner that it requires the proverbial Philadelphia lawyer to comprehend the terms embodied in it, the courts should and will construe them liberally in favor of the insured and strictly against the insurer to protect the buying public who rely upon the companies and agencies in such transactions.[3]
*529 The decision of the District Court of Appeal is quashed and this cause remanded for further proceedings consistent with the views here expressed.
It is so ordered.
ROBERTS, O'CONNELL and ERVIN, JJ., and JOHNSON, District Judge, concur.
THORNAL, C.J., and THOMAS, J., dissent.
NOTES
[1] 171 So.2d 439.
[2] This policy was attached to and made a part of the complaint below.
[3] The Attorney General was allowed, on behalf of the State Treasurer and ex-officio Insurance Commissioner, to appear and file a brief as Amicus Curiae here. The following observations bearing vitally on the merits of this controversy are extracted from his brief:

"Comprehensive automobile physical damage coverage includes theft coverage and a charge is made in the comprehensive rate for such coverage. In an article entitled `Automobile Physical Damage Ratemaking,' appearing at Page 123 of Volume XLVI, 1959, of the `Prooceedings of the Casualty Actuarial Society,' Luther L. Tarbell, Jr., a Fellow of this society, makes these comments:
"`The Automobile Physical Damage line of insurance embraces the more commonly known coverage of Automobile Fire, Automobile Fire and Theft, Automobile Comprehensive, (which encompasses Fire and Theft plus additional coverages) and Automobile Collision. The manual rates for these coverages are made for a great majority of insurance companies by the National Automobile Underwriters Association. The present rate-making procedure of the NAUA was established in 1952. * * *
"`The NAUA is the statistical bureau for all states (except Louisiana North Carolina, Texas and Virginia), the District of Columbia, Alaska and Puerto Rico. Member companies of the NAUA are obligated to report their experience on all risks written in these jurisdictions, while subscriber companies are to report their experience in any states and territories in which they are subscribers. * * *" (emphasis supplied) (Page 123)
* * * * *
"`The original tables of relativities were developed for Fire coverage and for Theft coverage with Comprehensive being determined by combining these schedules and loading them for the additional hazards covered under this form of policy. Since comprehensive has become the major coverage (accounting for more than 90% of the "other than collision" private passenger premium) the tables are now designed to reflect the relationship between various symbols for comprehensive coverage. Fire rates and Fire and Theft rates are now quoted as percentages of comprehensive rates so that they retain the same relativity as the comprehensive rates.' (Emphasis supplied) (Page 132)
* * * * *
"`Fire, and Fire and Theft coverage are related to the Comprehensive rates so that any change developed for Comprehensive is reflected in these rates. The experience for Fire, and Fire and Theft is reviewed on a statewide basis and the relationship percentages adjusted as the experience of these coverages follows or differs from that of Comprehensive coverage.' (Page 133-134)"
"Text writers on insurance recognize that comprehensive coverage is indeed just that  comprehensive in its coverage. Appleman, Insurance Law and Practice, Volume 5, Section 3222, Page 375, states:
"`Most companies have now adopted the policy of writing what is termed "comprehensive" coverage, which is for the purpose of including all property damage to an automobile, other than mechanical breakdown, exclusive of collision losses. It includes all of the older coverages, herein separately discussed, such as fire, theft, damage caused from force of the elements, and, in addition, many new losses never before contemplated by any coverage whatever. It is a simple and convenient form of insurance, in that it eliminates any necessity of determining overlapping of fire and theft coverages, and when there is a question as to whether a loss is due to collision or other means, if the insured carries both collision and comprehensive, any debate becomes unnecessary, except as to the deductible provisions of the policy. In that event, some question might still arise, to determine whether or not the insured must bear a certain share of the loss. Most companies, however, have now adopted the liberal plan in such close cases of paying the full extent of the loss under comprehensive. (emphasis supplied)'"