400 So.2d 526 (1981)
NATIONAL MERCHANDISE CO., INC., D/B/a Pic-N-Save Drugs, and Maryland Casualty Company, Appellants,
v.
UNITED SERVICE AUTOMOBILE ASSOCIATION and Jerome C. Cohan and Lyndia Cohan Boyd, Etc., et al., Appellees.
No. UU-32.
District Court of Appeal of Florida, First District.
June 17, 1981.
*528 James C. Rinaman, Jr., of Marks, Gray, Conroy & Gibbs, Noah H. Jenerette, Jr., of Boyd, Jenerette, Lemis & Staas, Jacksonville, for appellants.
John I. Todd, Jr., Lane Thomas Burnett, John F. Fannin, Christopher W. Gardner, Richard W. Kreidler, and William R. Swain, Jacksonville, for appellees.
PER CURIAM.
The appellants, National Merchandise Co., Inc. (Pic-N-Save Drug Stores) and Maryland Casualty Co., seek reversal of a summary judgment granted to appellee, United Services Automobile Association (U.S.A.A.). We are asked to review U.S.A.A.'s plain language, simplified insurance policy, providing coverage for bodily injury incurred due to an "auto accident." The alleged "auto accident" involves a four-year old child who ingested drugs while seated in the insured's car and later expired. The trial judge granted summary judgment based upon his determination that the death of the child did not result from an auto accident and was, therefore, not within the coverage of the policy. Our review of the record and the applicable law leads us to a contrary conclusion. We therefore reverse.
A brief review of the facts as disclosed by the pleadings, exhibits and depositions is essential to the disposition of this appeal. During 1978, Paul Cohen worked for Pic-N-Save as a pharmaceutical supervisor in Jacksonville. One of his duties was to transfer drugs from one retail outlet to another. For this purpose, he used his station wagon, but Pic-N-Save reimbursed him for car insurance, gas, and repairs. Cohen indicated in a deposition that it was not unusual for him to leave drugs in his car overnight or over a weekend, although this procedure was apparently unknown to Cohen's supervisor. Cohen spent a lot of time on the road, since he supervised and delivered drugs to eight different stores in North Florida and South Georgia.
On Wednesday, June 14, 1978, Cohen picked up some drugs from one of the Jacksonville stores. The drugs remained in his car Wednesday, Thursday and Friday. During working hours on Friday, June 16, he decided to stop by his home to estimate how much cement he would need to put up a wall in his back yard. At home he found his nephew, David, age four, and his niece, age two. Since they wanted to go for a ride with him, he took them to the hardware store. He was in the store for about ten minutes, while the two children waited in the car. Some drugs remained in a bag on the front floorboard on the passenger side of the car. When he returned, he found the drugs had been moved. Fearing that the children had done something with the drugs, he questioned them as to whether or not they had touched the drugs. They apparently assured him that they had not touched the drugs.
Cohen then drove home, dropped off the children and the cement, and returned to his job duties. He returned home at 5:30 p.m. and found his nephew lying on the couch, having convulsions. He realized that young David had apparently taken some of the drugs while in the car earlier. A rescue squad was called. David was taken to the hospital, where he died.
A wrongful death claim was subsequently filed by David's parents alleging that David died as a result of taking a prescription drug while a passenger in defendant Paul Cohen's car. David's parents sued Paul Cohen, Pic-N-Save, and Pic-N-Save's insurance carrier (Maryland Casualty Co.). Pic-N-Save filed a number of third-party claims. One of the claims was against U.S.A.A., the appellee, as the insurer of Paul Cohen's car. U.S.A.A. moved for summary judgment, stating that because of the wording of its policy it could not be held liable. The trial judge granted U.S.A.A.'s motion.
U.S.A.A.'s potential liability is based upon the interpretation of a clause in the *529 appellee's policy known as "The Easy Reading Auto Policy." The policy is ten pages long with nine pages of special endorsements and provisions relevant to Florida coverage. The ten-page standard policy is in large, neatly-spaced type. Various sections are clearly set off from each other, and each section is titled in distinct, bold block letters. Each subsection has titles with slightly smaller bold black lettering. Various key words and phrases are in small bold type and defined elsewhere in the policy.
"Part A  Liability Coverage" on page one states: "We will pay damages for bodily injury or property damage for which any covered person becomes legally responsible because of an auto accident" (emphasis supplied). Unfortunately, the term "auto accident" is not defined in the policy nor by law. The appellees claimed that young David's death was not due to an "auto accident." Their contention, with which the trial judge agreed, is that although the accident occurred in the auto, the auto was merely the situs and not causally related to the accident. Before discussing that issue, we offer the following comments on the "Easy Reading Auto Policy" and its relationship to this case.
Over one hundred years ago, Chief Justice Doe of the New Hampshire Supreme Court in DeLancey v. Insurance Co., 52 N.H. 581 (1873), complained about complex wording and fine print in insurance policies. He wrote (Id. at 587-588):
... they would not be understood by men in general, even if [the policies were] subjected to a careful and laborious study: by men in general, they were sure not to be studied at all. The study of them was rendered particularly unattractive, by a profuse intermixture of discourses on subjects in which the premium payer would have no interest. The compound, if read by him, would, unless he were an extraordinary man, be an inexplicable riddle, a mere flood of darkness and confusion. Some of the most material stipulations were concealed in a mass of rubbish on the back side of the policy and the following page * * * where scarcely any one would think of looking for information so important.
* * * As if it were feared that notwithstanding these discouraging circumstances, some extremely eccentric person might attempt to examine and understand the meaning of the involved and intricate net in which he was to be entangled, it was printed in such small type, and in lines so long and crowded, that the perusal of it was made physically difficult, painful, and injurious.
Chief Justice Doe stated that he felt such a policy was little more than a fraud. Id. at 588. More recently, the New Hampshire Supreme Court stated:
Although insurers had over one hundred years to hone their policies into forms that would not ferry the unwary reader on a trip through Wonderland, they regrettably have not seen fit to do so. Insurance policies today often fully merit the criticism that Chief Justice Doe levelled at their predecessors.
Storms v. U.S. Fidelity and Guaranty Co., 118 N.H. 427, 388 A.2d 578, 579-580 (1978). Florida and other jurisdictions have also made it clear that an insurer has a duty to make its policy provisions and words plain, clear, and prominent to the layman, in a form which he can understand, especially in regard to coverage provisions. Hartnett v. Southern Insurance Company, 181 So.2d 524 (Fla. 1965); Read v. Western Farm Bureau, Mutual Insurance Co., 90 N.M. 369, 563 P.2d 1162, 1167 (Ct.App. 1977); Allstate Insurance Co. v. Reeves, 66 Cal. App.3d 464, 136 Cal. Rptr. 159, 162 (1977).
We note with approval that U.S.A.A. has apparently taken the words of the New Hampshire jurists to heart and made a creditable effort to provide the public with a policy that can be read, with perhaps a better degree of understanding, by the average policyholder.[1] However, brevity and *530 clarity are not necessarily synonymous, as we have learned in attempting to arrive at a decision in this case.
U.S.A.A. argues that a commonsense reading of its "plain language" policy, which provides coverage for "auto accidents," does not cover situations such as occurred in this case. On the other hand, the appellants advocate the view that the term "auto accident" in the simplified insurance policy is ambiguous. When the terms used are ambiguous, we are required to construe the policy against U.S.A.A., because it drafted the policy. Excelsior Insurance Co. v. Pomona Park Bar & Package Store, 369 So.2d 938, 942 (Fla. 1979); Travelers Insurance Co. v. Smith, 328 So.2d 870, 872 (Fla. 3rd DCA 1976). Insurance policies are contracts, and it is well-established that contracts are construed against the drafter in the face of any ambiguities. Planck v. Traders Diversified, Inc., 387 So.2d 440, 441 (Fla. 4th DCA 1980); Hurt v. Leatherby Insurance Co., 380 So.2d 432, 434 (Fla. 1980). "This rule is especially true when the drafter stands in a position of trust, or greater professional or business knowledge... ." Planck, supra, at 442. If the insurer wishes to condition its contractual liability upon the insured's conformance with certain conduct, it must do so in clear, unambiguous language. Holz Rubber Co. Inc. v. American Star Insurance Co., 14 Cal.3d 45, 120 Cal. Rptr. 415, 423, 533 P.2d 1055, 1063 (1975).
Although the words "auto" and "accident" have definite or generally accepted meanings, these two words simply do not convey a meaning so clear and precise, for liability insurance coverage purposes, that one can determine whether a given accident, under many easily imagined circumstances, would or would not be covered. In this sense, the terms are "ambiguous," hence the need for construction or interpretation. Roberson v. United Services Automobile Association, 330 So.2d 745 (Fla. 1st DCA 1975); Southside Motor Co. v. Transamerica Ins. Co., 380 So.2d 470 (Fla. 1st DCA 1980); Ellenwood v. Southern United Life Ins. Co., 373 So.2d 392 (Fla. 1st DCA 1979).
The insurer cannot, by failing to define the terms "auto accident" or to include any additional qualifying or exclusionary language, insist upon a narrow, restrictive interpretation of the coverage provided. See Roberson and Southside Motor Company, supra. Furthermore, while we acknowledge the duty to give effect to the "plain language" of the policy, automobile insurance litigation is infused with considerations of public policy, and our determination of the rights and obligations of the parties must also take into consideration relevant legislative enactments, established custom and usage in the insurance industry, and the body of case law touching upon coverage questions similar to the one before us.
There is a virtual parade of Florida auto insurance cases dealing with clauses insuring against injury "arising out of the ownership, maintenance or use" of an automobile. See, e.g., Denbaum v. Allstate Ins. Co., 374 So.2d 44 (Fla. 3rd DCA 1979); Hutchins v. Mills, 363 So.2d 818 (Fla. 1st DCA 1978), cert. denied 368 So.2d 1368 (Fla. 1979); Hertz Corp. v. Pugh, 354 So.2d 966 (Fla. 1st DCA 1978); National Indemnity Co. v. Corbo, 248 So.2d 238 (Fla. 3rd DCA 1971).[2] It is apparent to us that the words *531 "arising out of the ownership, maintenance or use" of an automobile do not appear in insurance policies by mere happenstance. This is common and customary boiler plate language used in auto insurance contracts to define the scope and extent of coverage provided. The significance of this language is also evident in Florida's statutes dealing with insurance. For example, a "motor vehicle liability policy" has been defined as an owner's or operator's liability policy insurance "against loss from liability for bodily injury, death and property damage arising out of the ownership, maintenance or use of a motor vehicle ..." Section 324.021(8), Florida Statutes (1979).[3]
In Section 627.727(1), Florida Statutes (1979), the Legislature has directed that uninsured vehicle coverage be provided in auto insurance policies delivered in this state. This coverage must be supplied in any "automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle ..." Id. Likewise, personal injury protection "arising our of the ownership, maintenance, or use of a motor vehicle" is required in auto policies. Section 627.736(1), Florida Statutes (1979). See also Sections 627.737(1) and 627.7372, Florida Statutes. This terminology is not only standardized in the industry, but we perceive it as expressive of the public policy of the state insofar as auto accident insurance protection is concerned.
Thus, confronted with a term that is standardized in the industry, we must recognize the principle that "usage of trade which is so well settled and generally known that all persons engaged in such trade may be considered as contracting with reference to it, has been regarded as forming a part of a contract of insurance entered into to protect risks in such trade." 13 Appleman, Insurance Law and Practice, § 7388 at 189 (1976). Commercial transactions and contracts should be interpreted in light of custom or trade usage. Carr v. Stockton, 84 Fla. 69, 92 So. 814, 815 (1922); Fred S. Conrad Construction Co. v. Exchange Bank, 178 So.2d 217, 221 (Fla. 1st DCA 1965). Since we are also confronted, as we have indicated, with the statutory policy pronouncements that auto insurance coverage is extended to accidents "arising out of the ownership, maintenance or use of a motor vehicle," we must be guided further by the principle that the law of this state is a basic ingredient of every contract. Board of Public Instruction v. Bay Harbor Islands, 81 So.2d 637 (Fla. 1955). The law in existence at the time of the making of a contract forms a part of that contract, as if it were expressly referred to in its terms. General Development Corp. v. Catlin, 139 So.2d 901, 903 (Fla. 3rd DCA 1962).
We conclude, based upon the foregoing analysis, that the term "auto accident," as used in U.S.A.A.'s policy, must be construed to mean that insurance will be provided for accidents "arising out of the ownership, maintenance or use of a motor vehicle." Thus, it only remains for us to consider the facts of this case in relation to this terminology. "Most courts have not troubled to state whether their results are determined under the term `use,' or whether it is under `maintenance' or `operation' [or `ownership']. Generally, it is a combination of the three terms which induces the final result." 6B Appleman, Insurance Law and Practice, § 4311 at 316 (1979). We think *532 this case most aptly falls under the "use" provision of the clause, although we do not think that a ruling induced by a combination of all three terms is precluded. In analyzing whether or not the facts of this case fall within the "use" coverage of the policy, a three-pronged test has been suggested:
1. The accident must have arisen out of the inherent nature of the automobile, as such;
2. The accident must have arisen within the natural territorial limits of an automobile, and the actual use, ... must not have terminated;
3. The automobile must not merely contribute to cause the condition which produces the injury, but must, itself, produce the injury.
Id. at § 4317 at 367-369.
The first prong requires that the "use" arise out of the "inherent nature" of the car.[4] That an automobile is used to transport and even store items, either personal or commercial in nature, seems to us inherent. Paul Cohen testified at a deposition that it was his common practice to leave or store drugs in his car for a few days at a time. In this case, the car was used in a commercial sense to transport drugs from one location to another. In fact, when one looks at Cohen's job duties of transporting drugs and his extensive use of his car in his job, his car is really his "office on wheels."
The second prong of the test requires that the accident occur within the territory of the auto and that the "use" not have terminated. Again, it is apparent that the drugs were at the least still being stored in Cohen's "office." The delivery had not been completed, merely suspended.
The third prong presents a more difficult problem. In Watson v. Watson, 326 So.2d 48, 49 (Fla. 2nd DCA 1976), Judge Grimes noted that this prong defines "arising out of [the use]" to mean "originating from," "growing out of," or "flowing from." A showing of proximate cause between the use of the car and the auto accident is not required. What is required is that a "causal connection or relation" between the two is shown. Id. at 49.[5] A causal connection between the use of the automobile and the injury was not shown in Florida Farm Bureau v. Shaffer, supra (footnote 2), merely by the fact that the plaintiff was injured by shots fired from an automobile, where the policy provided coverage for bodily injury sustained as a result of the "`use of any auto,'" (Id. at 217). On the other hand, in Valdes v. Smalley, supra (footnote 2), the court found that the accident in which the plaintiff was struck by a beer mug thrown from an automobile traveling forty miles per hour was "causally connected to the use of the automobile," rather than a remote or mere "`intervening event' bearing no substantial or direct relation to the use of the vehicle." Id. at 345.
Since we are here concerned with a provision of the policy relating to coverage, rather than exclusions from coverage, the terms used must be liberally construed in favor of the injured party. Valdes v. Smalley, supra. In view of the broad and comprehensive sense in which the term "auto accident" may be construed, we consider that only a minimal causal connection between the use of the automobile and the injury is required for coverage to apply. See National American Insurance Co. v. *533 Insurance Co. of North America, 74 Cal. App.3d 565, 140 Cal. Rptr. 828 (1977).
We think the facts of this case are sufficient to establish a "minimal causal connection" so as to withstand a motion for summary judgment. The case closest on point is National Indemnity Co. v. Corbo, supra. In Corbo, the insured's son invited the plaintiff to ride with him. The insured's son was in the process of taking a watchdog from his home to a store for the evening. On the way, the insured stopped at a drug store. The plaintiff stayed in the car, and the dog bit him. Plaintiff sued, and the court ruled that the plaintiff could recover based on the policy language. The language insured against bodily injury for any accident "arising out of the ownership, maintenance or use of the automobile."
According to our reading of the case, the Corbo court considered that the primary use of the car was to transport the dog. When the insured stopped at a drug store, the "use" has not been terminated, merely suspended. In this case, the insured was using his car primarily in an ongoing sense as his "office on wheels." His employer paid all his auto insurance and other costs, which seems to further confirm this. The car was used to store drugs, and this use had not been terminated. Likewise, even though the insured was not on his way to make a delivery of drugs at the time of the accident, the insured had picked up the drugs for transport purposes. The car's use for this purpose had not been terminated.
We therefore conclude that the trial court erred in determining as a matter of law, under the facts as we have reviewed them, that no coverage was provided under U.S.A.A.'s policy. The judgment is reversed and this cause is remanded for further proceedings.
ERVIN, LARRY G. SMITH and SHIVERS, JJ., concur.
NOTES
[1] We note the trend toward "easy reading" or "plain language" documents. The New York Legislature has enacted N.Y. Insurance Law § 168 (Consol. 1974) which permits "simplified policies of insurance" to be authorized by state government. More recently a law requiring that any contract to which a consumer is a party involving $50,000 or under must be: "1. Written in a clear and coherent manner using words with common and everyday meanings; [and] 2. Appropriately divided and captioned by its various sections." N.Y.Gen. Obligation Law § 5-702 (Consol. 1978). Even President Carter gave substantial consideration to compelling all Federal agencies to write official rules and regulations in "plain English." Proposed Executive Order, 42 Fed.Register 59740 (November 18, 1977); see also Givens, Richard A., The "Plain English" Law, 50 N.Y. Bar Journal 479 (1978) for coverage of the public interest generated by this concept.
[2] See, also, Florida Farm Bureau v. Shaffer, 391 So.2d 216 (Fla. 4th DCA 1980); Feltner v. Hartford Accident and Indemnity Co., 336 So.2d 142 (Fla. 2nd DCA 1976); Valdes v. Smalley, 303 So.2d 342 (Fla. 3rd DCA 1974), cert. discharged National Ben Franklin Ins. Co. v. Valdes, 341 So.2d 975 (Fla. 1976); General Accident, Fire and Life Assurance Corp. v. Appleton, 355 So.2d 1261 (Fla. 4th DCA 1978); Watson v. Watson, 326 So.2d 48 (Fla. 2nd DCA 1976); and Automobile Liability Insurance: What are Accident or Injuries "Arising Out of Ownership, Maintenance, or Use" of Insured Vehicle, 89 A.L.R.2d 150.
[3] While it is true that this definition is part of the Financial Responsibility requirements which are not involved in this case, nor does the insured Paul Cohen fall under these requirements at this time, so far as we know, we simply point out the wording that our Legislature has chosen to use in this insurance statute. Furthermore, Section 324.151(1)(a), Florida Statutes (1971), which is also part of the Financial Responsibility scheme, requires the description of all vehicles in an owner's liability policy so that they may be insured "against damage arising out of the ownership, maintenance, or use of such motor vehicle... ."
[4] This court utilized the first prong of the test in Hutchins v. Mills, 363 So.2d 818 (Fla. 1st DCA 1978), cert. denied 368 So.2d 1368 (Fla. 1979). In that case, a car was used as a stand to steady a rifle for the purpose of shooting a deer. The hunter missed and killed another person. Suit was filed against the auto insurer, claiming that the accident arose out of the use of the car. Liability was denied based in part upon the court's determination that the use "was not such as arises out of the inherent nature of the motor vehicle."
[5] The Fourth District in General Accident Fire and Life Assurance Corporation, supra (footnote 2), has suggested that causal connection "may be established by showing that the automobile itself was used to inflict the bodily injury, as in Leatherby, or that the automobile was used in some manner that contributed or added to the bodily injury, as in Valdes." Id. at 1263. See Leatherby Insurance Co. v. Willoughby, 315 So.2d 553 (Fla. 2nd DCA 1975), and Valdes v. Smalley, supra (footnote 2).