POLSTON, C.J.,
dissenting.
I respectfully dissent. The insurance policy is not ambiguous. It means what it plainly says, that the insurer “will increase the Home Health Care Daily Benefit payable under this policy by the Automatic Benefit Increase Percentage shown on the schedule page.” (Emphasis added.) No reference is made to increasing the Per Occurrence Maximum Benefit and the Lifetime Maximum Benefit Amount, which are both defined without reference to the automatic increase and listed separately as line items on the schedule page. Moreover, if the policy was ambiguous, our precedent requires allowing the admission of extrinsic evidence to determine the policy’s meaning.

I. The Policy Is Not Ambiguous

Based on the plain language of the policy, the 8% automatic increase applies solely to the daily benefit.[6] See State Farm Mut. Auto. Ins. Co. v. Menendez, 70 So.3d 566, 569-70 (Fla.2011) (“In interpreting an insurance contract, we are bound by the plain meaning of the contract’s text.”). Specifically, the policy expressly defines the automatic increase as applying only to the daily benefit:
B. AUTOMATIC DAILY BENEFIT INCREASE: On each policy anniversary, we will increase the Home Health Care Daily Benefit payable under this policy by the Automatic Benefit Increase Percentage shown on the schedule page.
Consistent with this language, the certificate schedule identifies the “Automatic Benefit Increase Percentage” as 8%. Therefore, on every policy anniversary, the daily home health care benefit limit increases by 8%.
Nowhere does the policy provide for an increase to the Per Occurrence Maximum Benefit and the Lifetime Maximum Benefit Amount, which the majority correctly *953 recognizes are caps on the total amount of daily benefits payable under the policy. See majority op. at 945-46. Moreover, the benefits section describes these to be caps, not benefits. The Home Health Care Benefits section of the policy states: “These benefits will be paid up to the Home Health Care Daily Benefit shown in the schedule. All benefits will be limited to the Per Occurrence Maximum Benefit for each injury or sickness and the Lifetime Maximum Benefit Amount for ALL injuries and sicknesses which are shown in the certificate schedule.” This Benefits section does not include within its definitional scope the caps provided by the Per Occurrence Maximum Benefit and the Lifetime Maximum Benefit Amount as benefits. Had it done so, the policy would have applied the automatic benefit increase to the caps as well as to the daily benefit. But instead, the policy definition explicitly makes the benefits subject to, not including, the limits of those caps.
Moreover, the certificate schedule separately lists these items rather than mixing them together, and shows the amounts of coverage provided by the policy:
CERTIFICATE SCHEDULE
HOME HEALTH CARE DAILY BENEFIT $180/Day
LIFETIME MAXIMUM BENEFIT AMOUNT $250,000
PER OCCURRENCE MAXIMUM BENEFIT $150,000/Illness
AUTOMATIC BENEFIT INCREASE PERCENTAGE Benefits increase by 8% each year
In interpreting the contract, the majority acknowledges, but fails to apply, the rule that the certificate schedule must be read together with the entire policy. See majority op. at 948; see also Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So.2d 161, 165 (Fla.2003) (“[W]hen analyzing an insurance contract, it is necessary to examine the contract in its context and as a whole, and to avoid simply concentrating on certain limited provisions to the exclusion of the totality of others.”); Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla.2000) (recognizing that for an ambiguity to exist in an insurance policy the language must be susceptible of more than one reasonable interpretation after the policy is read as a whole). When the policy is read as a whole, it is clear that the scope of what is included within the increase percentage is limited to what is expressly defined as the Home Health Care Daily Benefit, while the certificate schedule sets the amount of the daily benefit, sets the amount of the per occurrence and lifetime caps, and identifies the amount of the increase percentage (just as the policy’s definition of Automatic Daily Benefit Increase said it would), without expanding the scope of what the policy defined as being subject to the increase percentage. See Black’s Law Dictionary 1462 (9th ed. 2009) (defining a “schedule” as “a statement that is attached to a document and that gives a detailed showing of the matters referred to in the document”).
By concluding that the schedule functions to increase the caps higher than the policy actually says they are, the majority improperly rewrites the parties’ contract to provide coverage for which the parties did not bargain and the insureds did not pay.[7] See Excelsior Ins. Co. v. Pomona *954 Park Bar & Package Store, 369 So.2d 938, 942 (Fla.1979) (explaining that, in interpreting insurance contracts, courts are not permitted to “rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties”). The majority rewrites the policy to state: “On each policy anniversary, we will increase the Home Health Care Daily Benefit, the Per Occurrence Maximum Benefit, and the Lifetime Maximum Benefit Amount payable under the policy by the Automatic Benefit Increase Percentage shown on the schedule page.”
I would give effect to the policy as it is written by applying the automatic increase solely to the daily benefit. Accordingly, I would answer the main certified question in the negative.

II. If the Policy Was Ambiguous, Extrinsic Evidence Should Be Considered

Moreover, even if the contract was ambiguous (which it is not), it is well-settled Florida law that parties may attempt to resolve an ambiguity through available extrinsic evidence before applying the last-resort principle of construction against the drafter. To reach the opposite conclusion, the majority misconstrues the certified question and improperly recedes from our precedent.
In reaching its holding, the majority concludes that our precedent does not require “that extrinsic evidence must be considered in determining if an ambiguity exists.” Majority op. at 949 (emphasis added). I agree. Our precedent is clear that a contract must be ambiguous before extrinsic evidence may be introduced. See, e.g., Dimmitt Chevrolet, Inc. v. Se. Fid. Ins. Corp., 636 So.2d 700, 705 (Fla. 1993) (“Because we conclude that the policy language is unambiguous, we find it inappropriate and unnecessary to consider the arguments pertaining to the drafting history of the [clause].”). But significantly, this is beside the point, and the majority widely misses the mark by answering a question that the Eleventh Circuit has not asked. The Eleventh Circuit did not ask whether Florida law allows the use of extrinsic evidence to render a clear contract ambiguous. Instead, with sub-question B, the Eleventh Circuit asked: “If an ambiguity exists in this insurance policy — as we understand that it does — should courts first attempt to resolve the ambiguity by examining available extrinsic evidence?” Ruderman ex rel. Schwartz v. Wash. Nat’l Ins. Corp., 671 F.3d 1208, 1212 (11th Cir. 2012).
As discussed below, our precedent requires answering this question in the affirmative because our precedent provides that an ambiguous contract is construed against the insurer only as a last resort, meaning only after all available construction aids, including extrinsic evidence, fail to resolve the ambiguity.
Under Florida law, “the rights and obligations of the parties under an insurance policy are governed by contract law since they arose out of an insurance contract.” Lumbermens Mut. Cas. Co. v. August, 530 So.2d 293, 295 (Fla.1988). Whether any contract is ambiguous is a legal question. See DEC Elec., Inc. v. Raphael Constr. Corp., 558 So.2d 427, 428 (Fla.1990). If a contract is unambiguous, it must be enforced pursuant to its plain language. See Travelers Indem. Co. v. PCR Inc., 889 So.2d 779, 785 (Fla.2004). If, and only if, a contract is ambiguous should the court *955 construe it in order to determine the parties’ intent. See Se. Fire Ins. Co. v. Lehrman, 443 So.2d 408, 408-09 (Fla. 4th DCA 1984) (“Courts should resort to complex rules of construction to determine coverage or the applicability of exclusions only when the language used in the policy is ambiguous or otherwise susceptible of more than one meaning.”). If all available construction tools, including extrinsic evidence, fail to resolve the ambiguity, only then is the contract construed against the drafter, under the theory that “having chosen the language employed and being responsible for the alleged uncertainty and ambiguity,” the drafter “must suffer the result of having such [ambiguous] language construed against [it].” W. Yellow Pine Co. v. Sinclair, 83 Fla. 118, 90 So. 828, 831 (1922) (concluding that the rule of construing an ambiguous contract against its drafter “is not to be resorted to unless necessary” and “[w]here satisfactory results can be reached by other rules of analysis and construction, it may not be invoked”); see also Arriaga v. Fla. Pac. Farms, L.L.C., 305 F.3d 1228, 1247-48 (11th Cir.2002) (recognizing that, under Florida law, construction against the drafter is a rule of last resort that is to be applied only if all other aids of construction, including the use of extrinsic evidence, fail to resolve the ambiguity) (citing Excelsior, 369 So.2d at 942); DSL Internet Corp. v. TigerDirect, Inc., 907 So.2d 1203, 1205 (Fla. 3d DCA 2005) (“The construction-against-the-drafter principle is a rule of last resort and is inapplicable when there is evidence of the parties’ intent at the time they entered into the contract.”).
Florida insurance law has long adhered to this traditional contract analysis framework. In Excelsior, 369 So.2d at 942 (emphasis added), we recognized that determining the parties’ intent “is the central concern of the law of contracts even in the realm of insurance.” Accordingly, we held that ambiguous insurance contracts should be construed against the insurer as the drafter in the same circumstance that general contract law authorizes this result, namely “[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction. ” Id. (emphasis added).
Excelsior’s “ordinary rules of construction” include the use of extrinsic evidence, which is defined as “[e]vidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement.” Black’s Law Dictionary 637 (9th ed. 2009). For example, over 100 years ago, this Court explained that
[i]f a written contract is ambiguous or obscure in its terms, so that the contractual intention of the parties cannot be understood from a mere inspection of the instrument, extrinsic evidence of the subject-matter of the contract, of the relations of the parties to each other, and of the facts and circumstances surrounding them when they entered into the contract may be received to enable the court to make a proper interpretation of the instrument.
L’Engle v. Scottish Union & Nat’l Fire Ins. Co., 48 Fla. 82, 37 So. 462, 467 (1904) (quoting 9 Cyc. 772).
Many times since then, we have recognized the role that extrinsic evidence plays in the construction of ambiguous insurance contracts:
Where either general language or particular words or phrases used in insurance contracts are ‘ambiguous,’ that is, doubtful as to meaning, or, in the light of other facts, reasonably capable of having more than one meaning so that the one applicable to the contract in ques *956 tion cannot be ascertained without outside aid, extrinsic evidence may be introduced to explain the ambiguity.
Friedman, 56 So.2d at 517; see also Stuyvesant Ins. Co. v. Butler, 314 So.2d 567, 570-71 (Fla.1975) (approving reliance on extrinsic evidence to resolve a liability policy’s ambiguous use of the word “minor”); Price v. S. Home Ins. Co. of the Carolinas, 100 Fla. 338, 129 So. 748, 751 (1930) (“Evidence of the situation of the property and the parties, as well as other surrounding facts and circumstances at the time of the issuance of the policy, [wa]s admissible to aid the court in construing the word ‘additions.’ ”); 30B Fla. Jur.2d Insurance § 1590 (2d ed. 2013) (explaining that, “[i]n the case of an ambiguous insurance contract provision,” Florida courts “should consider extrinsic evidence to give effect to the parties’ intention”).
Moreover, since Excelsior, we have recognized that, in appropriate circumstances, extrinsic evidence may be considered to clarify the parties’ intent if an insurance contract is ambiguous. See Anderson, 756 So.2d at 36 (recognizing that a court “may consider established custom and usage in the insurance industry”) (citing Nat’l Merck. Co. v. United Serv. Auto. Ass’n, 400 So.2d 526, 530 (Fla. 1st DCA 1981)); Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co., 711 So.2d 1135, 1139 (Fla.1998) (concluding that “it would be inappropriate” to consider extrinsic evidence concerning the policy’s drafting history unless the Court first found the policy ambiguous); Dimmitt, 636 So.2d at 705 (same).
Likewise, our district courts allow the use of extrinsic evidence to resolve ambiguities in insurance contracts. See, e.g., Kiln PLC v. Advantage Gen. Ins. Co., Ltd., 80 So.3d 429, 432 (Fla. 4th DCA 2012) (“In the case of an ambiguous insurance policy, where extrinsic evidence is available, consideration of that evidence may be appropriate.”); Castillo v. State Farm Fla. Ins. Co., 971 So.2d 820, 823 (Fla. 3d DCA 2007) (holding that the insurance company’s internal operating guideline was “both instructive and admissible as parole evidence” to explain an ambiguous provision in an insurance contract); Williams v. Essex Ins. Co., 712 So.2d 1232, 1232 (Fla. 1st DCA 1998) (concluding that the parties were “entitled to offer extrinsic evidence as to the intent of the insurer and the insured at the time the policy was purchased” to resolve an ambiguity regarding the policy’s coverage); Mut. Fire, Marine & Inland Ins. Co. v. Fla. Testing & Eng’g Co., 511 So.2d 360, 363 (Fla. 5th DCA 1987) (concluding that the trial court correctly relied on extrinsic evidence to resolve an ambiguity in an insurance contract).
Federal courts have also recognized that Florida law allows the use of extrinsic evidence to clarify ambiguous insurance contracts. See, e.g., Estevez v. N. Assurance Co. of Am., 428 Fed.Appx. 966, 967 n. 1 (11th Cir.2011) (“[The insured’s] argument that extrinsic evidence is not admissible to resolve ambiguities in an insurance contract is without merit” under Florida law.); Burlington Ins. Co. v. Indus. Steel Fabricators, Inc., 387 Fed.Appx. 900, 902 (11th Cir.2010) (recognizing that, under Florida law, “if the relevant policy language is ambiguous then extrinsic evidence of the parties’ intentions may be introduced to explain the ambiguity”); Monticello Ins. Co. v. City of Miami Beach, 2009 WL 667454, at *10 (S.D.Fla.2009) (explaining that federal courts applying Florida law “have also found it appropriate to admit extrinsic evidence to resolve the ambiguity in insurance policies”); Great Am. Ins. Co. v. Nat’l Union Fire Ins. Co. of Pittsburgh, Pa., 574 F.Supp.2d 1294, 1299 (S.D.Fla.2008) (quoting Friedman, 56 *957 So.2d at 517, for the proposition that where an insurance contract is ambiguous and, therefore, its meaning “cannot be ascertained without outside aid, extrinsic evidence may be introduced to explain the meaning”).
These decisions are in accord with insurance treatises explaining that contract law traditionally allows the use of extrinsic evidence to attempt to resolve an ambiguous insurance contract instead of simply construing it against the drafter. For example, Couch on Insurance provides that the
rule of strict construction of an ambiguous policy against [the] insurer is a rule of last resort, and not to be permitted to frustrate [the] parties’ expressed intention if such intention could be otherwise ascertained, where there is extrinsic evidence of [the] parties’ intention, which is pro[f]ferred and admissible, and which resolved [the] ambiguity, albeit in favor of noncoverage, the rule of strict construction need not be applied.
2 Steven Plitt, Daniel Maldonado, and Joshua D. Rogers, Couch on Insurance § 22:16 (3d ed. 2012) (footnote omitted); see also 1 Barbara O’Donnell, Law and Practice of Insurance Coverage Litigation § 1:6 (2012) (explaining that, under “traditional contract interpretation analysis,” the rule of construing the ambiguity against the insurer is a “rule of last resort” applicable only where other construction aids, including the use of extrinsic evidence, fail); 2 Allan D. Windt, Insurance Claims and Disputes 5th § 6:2 (2012) (“[I]f a policy term is ambiguous, the court should consider extrinsic evidence in an attempt to resolve the ambiguity to reflect the parties actual intent.”); Robert H. Jerry, II & Douglas R. Richmond, Understanding Insurance Law 129 (5th ed.2012) (recognizing that where a contract is unclear within its four corners “evidence extrinsic to the writing can be examined for the purpose of determining a document’s meaning”); 1-5 Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition § 5.04 (2012) (explaining that “[u]nder the contract law approach to ambiguity” finding an insurance policy ambiguous “opens the matter to extrinsic evidence”).
Accordingly, if extrinsic evidence resolves the ambiguity, the policy is enforced pursuant to its clarified meaning. Because the ambiguity has been resolved, there is no justification for applying the last-resort rule of construction against the drafter. See Excelsior; 369 So.2d at 942 (holding that the rule of construction against the drafter is inapplicable because it may be applied “[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction”).
While some states have moved away from attempting to discern the parties’ intent using the ordinary rules of contract construction (particularly extrinsic evidence) in favor of a pro-insured rule that automatically construes an ambiguous insurance contract against the insurer, until today, Florida has not. See 1 Barbara O’Donnell, Law and Practice of Insurance Coverage Litigation § 1:11 (2012) (noting that New Jersey, Indiana, and Texas subscribe to the rule that “any ambiguity in the relevant policy language is automatically construed in favor of coverage” while other states, including Florida, construe an ambiguity against an insurer “only after exhausting efforts to discern the meaning of disputed language through reference to extrinsic evidence”) (footnotes omitted).
None of the decisions the majority cites[8] justifies its departure from our es *958 tablished framework for construing insurance contracts, under which “[t]he central concern ... is the intent of the parties,” just as it is with any contract. Travelers Ins. Co. v. Bartoszewicz, 404 So.2d 1053, 1054 (Fla.1981) (citing Excelsior, 369 So.2d at 942). To the contrary, as discussed above, two of them indicate that extrinsic evidence may be considered in appropriate circumstances. See Deni, 711 So.2d at 1139; Anderson, 756 So.2d at 36. The others are unhelpful in answering the certified question concerning extrinsic evidence because they either find no ambiguity or simply recite the general last-resort rule that an ambiguous insurance contract is to be construed against the insurer without indicating whether the parties attempted to resolve the ambiguity with extrinsic evidence. Because we do not silently overturn our precedent, it is inappropriate to read a prohibition against extrinsic evidence into general statements of law from cases that, for all we know, had nothing to do with extrinsic evidence.[9] See Puryear v. State, 810 So.2d 901, 905 (Fla.2002) (“[T]his Court does not intentionally overrule itself sub silentio.”). Accordingly, by applying the rule that ambiguities are construed against the insurer other than as a rule of last resort, the majority recedes from precedent and prematurely abandons the search for the parties’ intent.

III. Conclusion

Because the majority ignores the plain language of the contract and our binding precedent, I respectfully dissent. I would answer the main certified question and sub-questions A and C in the negative because the policy plainly limits the automatic increase to the daily benefit that does not include the caps. In addition, I would answer sub-question B in the affirmative because well-settled Florida law allows the use of available extrinsic evidence to construe an ambiguous insurance contract, and no justification has been given for receding from our precedent.
QUINCE and CANADY, JJ., concur.

. Whether the policy is ambiguous is a legal question. See Friedman v. Va. Metal Prods. Corp., 56 So.2d 515, 516 (Fla.1952).

. As the appellant explains in its initial brief without challenge by the appellees, the insureds paid premiums for coverage with $150,000 per occurrence and $250,000 lifetime caps, and
[t]he 8% escalator was never designed to increase the caps from $150,000 and $250,000 to over $1,000,000 each, and it is entirely inappropriate to interpret the Policy to accomplish that result. If a Policyholder *954 purchased the Policy at age 55, by the time he or she turned 80 the per occurrence cap would, if the escalator applied, skyrocket to $1,027,271, and the lifetime maximum cap would balloon to $1,712,188. Assuming that "24/7” care costs $400/day, the policy would provide 4,280 days — nearly 12 years — of "24/7” care.

. See majority op. at 949-51.

. As the appellant noted in its reply brief, it is likely that many of our insurance cases discuss the rule of construing ambiguous contracts against the insurer without explaining the role that extrinsic evidence plays in construction because extrinsic evidence of the parties’ intent is rarely available to resolve the types of ambiguities that arise in insurance contracts. But in this case, Washington National desires to introduce extrinsic evidence explaining how the automatic increase applies, such as marketing evidence and evidence of the insureds’ understanding.