**CREATIVE HOSPITALITY VENTURES, INC., et al., Plaintiffs,**

v.

**UNITED STATES LIABILITY INSURANCE COMPANY, d/b/a United States Liability Insurance Group, et al., Defendants.**

Case No. 08–22302–CIV.

United States District Court, S.D. Florida.

Sept. 30, 2009.

**1318**

Joel Victor Lumer, Bruce Benjamin Baldwin, Curtis Jay Mase, Richard David Lara, Leah H. Martinez, Mase & Lara PA, Miami, FL, for Plaintiffs.

Melanie Bernstein Chapman, Fowler White Burnett, Fort Lauderdale, FL.

Carmen Yolanda Cartaya, McIntosh Sawran Peltz & Cartaya, P.A., Miami, FL, Dawn Marshall, McIntosh Sawran Peltz Cartaya & Petruccelli, Fort Lauderdale, FL, for Defendants.

## ORDER

WILLIAM J. ZLOCH, District Judge.

THIS MATTER is before the Court upon the Report And Recommendation (DE 65) filed herein by United States Magistrate Judge Robin S. Rosenbaum. The Court has conducted a *de novo* review of the entire record herein and is otherwise fully advised in the premises.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. The Court reserves ruling on the Report And Recommendation (DE 65) filed herein by United States Magistrate Judge Robin S. Rosenbaum as it pertains to the Defendant Essex Insurance Company's Motion to Dismiss (DE 24) and Defendant Essex Insurance Company's Objections to Magistrate's Report and Recommendation (DE 66);

2. As it pertains to Defendant United States Liability Insurance Company's Motion To Dismiss (DE 18), the Report and

Recommendation (DE 65) filed herein by United States Magistrate Judge Robin S. Rosenbaum be and the same is hereby approved, adopted and ratified;

3. Defendant United States Liability Insurance Company's Motion To Dismiss (DE 18) be and the same is hereby granted; and

4. Final Order Of Dismissal will be entered by separate order.

## REPORT AND RECOMMENDATION

ROBIN S. ROSENBAUM, United States Magistrate Judge.

This matter is before the Court upon Defendant United States Liability Insurance Company's and Defendant Essex Insurance Company's Motions to Dismiss [D.E. 18, D.E. 24], referred to me for report and recommendation by the Honorable William J. Zloch. *See* D.E. 64. Upon consideration of the pending Motions, all filings in support thereof and in opposition thereto, the parties' responses to the Court's April 14, 2009, Order [D.E. 43], and the entire record, I make this Report and Recommendation recommending that Defendant United States Liability Insurance Company's Motion to Dismiss [D.E. 18] be granted, and Defendant Essex Insurance Company's Motion to Dismiss [D.E. 24] be denied.

### I. Background

In this matter Plaintiffs Creative Hospitality Ventures, Inc. ("Creative"), and E.T. Limited, Inc. ("E.T."), (collectively, "Plaintiffs"), seek a declaratory judgment against their respective insurers, Defendants United States Liability Insurance Company ("USLI") and Essex Insurance Company, Inc. ("Essex"), (collectively, "Defendants"). Specifically, Plaintiffs ask the Court to find that Defendants are bound by insurance policies they issued to Plaintiffs to defend and indemnify Plaintiffs in underlying lawsuits filed against them.

This case finds its origins in *Turner v. Creative Hospitality Ventures, Inc.,* Case No. 08–61040–CIV–ZLOCH/SNOW (S.D.Fla.) (*"Turner "*), and *Chavoustie v. E.T. Limited, Inc.,* Case No. 08–20099 (Fla. 11th Circ.Ct.) (*"Chavoustie "*).[1] In *Turner,* Daniel Turner ("Turner"), a customer at a restaurant operated by Creative, sued Creative for damages resulting from alleged violations of the Fair and Accurate Credit Transactions Act, 15 U.S.C. § 1681c(g) ("FACTA"). *See* D.E. 47–4. Section 1681c(g) provides, in relevant part,

(g) Truncation of credit card and debit card numbers

(1) In general

Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction.

(2) Limitation

---

1. Originally, this case involved a third plaintiff, Fresh Concept Restaurants I, LLC, and a third defendant, Zurich North America. The Court dismissed the action against Zurich North America, however, after Plaintiff Fresh Concept Restaurants I, LLC, filed its Notice of Voluntary Dismissal [D.E. 45]. *See* D.E. 50. When Plaintiffs filed their Second Amended Complaint following Fresh Concept Restau- rants I, LLC's filing of its Notice of Voluntary Dismissal, the new pleading did not allege that Fresh Concept Restaurants I, LLC, con- tinued to be a Plaintiff in this matter. Conse- quently, for the sake of clarity and simplicity, this Report and Recommendation does not purport to describe the litigation as it per- tained previously to Fresh Concept Restau- rants I, LLC, or Zurich North America.

This subsection shall apply only to receipts that are electronically printed, and shall not apply to transactions in which the sole means of recording a credit card or debit card account number is by handwriting or by an imprint or copy of the card.

\* \* \* \* \*

FACTA imposes liability for willful and negligent violations of this provision as well as other directives of the FACTA. Under the statutory scheme, 15 U.S.C. § 1681o makes violators of FACTA liable for negligent noncompliance:

(a) In general

Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—

(1) any actual damages sustained by the consumer as a result of the failure; and

(2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

\* \* \* \* \*

Section 1681n, on the other hand, establishes liability for willful violators:

(a) In general

Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—

(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; . . .

\* \* \* \* \*

(2) such amount of punitive damages as the court may allow; and

(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court. . . .

\* \* \* \* \*

15 U.S.C. 1681n.

Turner, who sued for damages on his own behalf and on behalf of those similarly situated, alleged that on July 1, 2008, after Turner tendered his credit or debit card to pay for items Creative served him at its restaurant, Creative's restaurant issued Turner an electronically printed receipt bearing the expiration date of Turner's card, in violation of FACTA. *Id.* After receipt of service of the lawsuit, Creative invoked its insurance policy with USLI and requested coverage, seeking a defense to the lawsuit and indemnity. *See* D.E. 47 at 1 & 12; Counts I and II. USLI denied coverage. *See id.*

*Chavoustie* involved similar allegations. In that case Eric Chavoustie ("Chavoustie"), suing for damages on his own behalf and on behalf of those similarly situated, claimed that on October 9, 2007, Chavoustie used a payment card to pay for items served to him at E.T.'s restaurant. *See* D.E. 47–5. After processing the payment card, E.T.'s restaurant issued Chavoustie an electronically printed receipt revealing more than five digits of Chavoustie's payment card account number, as well as the expiration date for Chavoustie's payment card. *Id.* at 4.[2] As Creative had requested of USLI in *Turner,* E.T. sought a defense to the lawsuit and indemnity, pursuant to its insurance policy with Essex. D.E. 47 at 1 & 12; Counts I and II. Essex denied coverage. *See id.*

---

2. This docket entry contains three different page numbers. Unless otherwise specifically indicated, the citations to all pages in docket entries in this Report and Recommendation shall be to the page numbers imprinted by the CM/ECF program at the tops of the pages.

Consequently, Plaintiffs filed the above-captioned lawsuit on behalf of themselves and those similarly situated, against Defendants and those similarly situated. *See* D.E. 47. In this case Plaintiffs ask the Court to issue a declaratory judgment finding that "Defendants and the members of the Defendant Class have a duty to defend [and indemnify] the Plaintiffs and the members of the Plaintiff Class in the FACTA lawsuits," and awarding damages incurred in the FACTA lawsuits (in the way of monies spent to defend the lawsuits and to pay any resulting judgment) and attorney's fees expended in the pending matter. *See id.* at 10–11.

On November 24, 2008, Defendant USLI filed its Motion to Dismiss [D.E. 18]. Essentially, Defendant USLI asserts that the insurance policy at issue does not cover the *Turner* lawsuit, so Defendant USLI bore no duty to defend nor indemnify Creative in that case. Defendant Essex likewise filed a similar Motion to Dismiss [D.E. 24] on December 15, 2008.

Plaintiff Creative filed a Response to [USLI's] Motion to Dismiss, although Plaintiff E.T. neither joined in Creative's Response nor filed its own response to USLI's Motion to Dismiss. [D.E. 25]. Similarly, while Plaintiff E.T. responded to Essex's Motion to Dismiss, *see* D.E. 28, Plaintiff Creative did not, and it did not join in Plaintiff E.T.'s Response. Defendants each filed a Reply in support of each Defendant's respective Motion to Dismiss. *See* D.E. 32 (Essex's Reply), D.E. 35 (USLI's Reply).

On April 14, 2009, Judge Zloch entered a *sua sponte* Order directing the parties to brief nine specific points as they related to Defendants' Motions to Dismiss. *See* D.E. 43. Additionally, Judge Zloch instructed Plaintiffs to file an amended complaint correctly alleging the citizenship of the parties to enable the Court to determine whether it has subject matter jurisdiction over this action, and to file individually exhibits to any amended complaint. *Id.*

Plaintiffs Creative and Essex jointly filed their Submission of Additional Briefing in accordance with the April 14, 2009, Order. *See* D.E. 53. Defendants followed suit, although separately filing their responses to the April 14, 2009, Order. *See* D.E. 54 (Essex's Response); D.E. 55 (USLI's Additional Briefing). Defendants also subsequently filed their responses to Plaintiffs' Submission of Additional Briefing. *See* D.E. 61 (Essex's Response); D.E. 62 (USLI's Response).

On August 6, 2009, Judge Zloch referred the matter to me for Report and Recommendation. *See* D.E. 64. This matter is now ripe for consideration.

## II. Analysis

Defendants seek to dismiss this case under Rule 12(b)(6), Fed.R.Civ.P., which authorizes motions to dismiss for "failure to state a claim upon which relief can be granted." Rule 8(a)(2), in turn, sets forth the requirements for pleading a claim in federal court: "A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief...." [3] This standard anticipates "notice pleading," or pleading that " 'give[s] the defendant fair notice of what the ... claim is

---

**3.** Rule 8(a)(1) imposes pleading standards with respect to jurisdiction, and Rule 8(a)(3) requires demands in complaints for the relief sought. Neither Defendant seeks dismissal under Rules 12(b)(1) or 12(b)(2), which govern jurisdiction, and neither Defendant suggests that Plaintiffs' Second Amended Complaint is deficient as it pertains to the relief sought, however, and the Court's independent review of the Second Amended Complaint reveals no obvious defects, either. As a result, this Report and Recommendation addresses the Second Amended Complaint's sufficiency under only Rule 8(a)(2).

and the grounds upon which it rests[.]' " *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (*"Twombly* ") (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *abrogated on different grounds by Twombly* ). In ruling on a motion to dismiss for failure to state a claim, a court must accept the allegations in the complaint as true, construing them broadly and in the light most favorable to the plaintiff. *Watts v. Florida Int'l Univ.,* 495 F.3d 1289, 1295 (11th Cir.2007) (citing *Levine v. World Fin. Network Nat'l Bank,* 437 F.3d 1118, 1120 (11th Cir.2006) and *Hawthorne v. Mac Adjustment, Inc.,* 140 F.3d 1367, 1370 (11th Cir.1998)).

As the Supreme Court has recently explained, "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do...." *Id.* (citations omitted). Instead, factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted). More specifically, stating a claim that will survive a Rule 12(b)(6) motion requires " 'enough factual matter [in the complaint] (taken as true) to suggest' " the required elements of the stated cause of action. *Watts v. Florida Int'l Univ.,* 495 F.3d at 1295 (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

■ In determining whether a complaint provides the requisite "factual mat-ter to suggest" the required elements, the court must consider whether the complaint asserts "plausible grounds to infer" the existence of each element of the cause of action. *See Twombly,* 550 U.S. at 556, 127 S.Ct. 1955. While a complaint need not establish a probability that facts supporting each element exist, it must provide "enough fact to raise a reasonable expectation that discovery will reveal evidence" of each element of the cause of action pled. *Id.* As the Supreme Court has cautioned, "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.' " *Id.* (citation omitted). This results from the fact that the touchstone of the analysis centers on plausibility.

With this framework in mind, the Court now turns to the Motions to Dismiss at issue here, pausing first to note that Defendants' respective Motions to Dismiss essentially address the allegations contained in the Second Amended Complaint that relate to each Defendant's specific insurance policy with its respective insured Plaintiff (*Creative v. USLI and E.T. v. Essex* ). Although each Defendant's Motion to Dismiss makes separate arguments, for ease of reference, the Court considers the common arguments together. Prior to doing so, however, the Court first addresses Defendant Essex's argument that Plaintiffs have alleged no case or controversy.

### A. Case or Controversy

Defendant Essex argues that E.T.[4] has not made allegations asserting that it has

---

**4.** Defendant Essex also argues that no case or controversy exists with regard to Plaintiff Creative or any of the putative class members because there is no legal or equitable relationship between Defendant Essex and those entities. The Second Amended Class Action Complaint in this case, however, is drafted broadly enough that it is susceptible to being read to allege facts showing a legal or equita-ble relationship between Essex and Creative or any of the putative class members. Because matters pertaining to the existence and nature of any legal or equitable relationship between Essex and Creative or any of the putative class members have not been briefed, the Court cannot discern definitively at this time whether any legal or equitable relationship between Defendant Essex and Plaintiff

an actual, practical and present need for a declaration nor that there is a *bona fide* controversy between Plaintiffs and this Defendant.... ET Limited, Inc., ... has not established that it has a *bona fide* dispute as to defense and indemnity under the subject Commercial General Liability insurance policy for the underlying claims for FACTA violations.

D.E. 24 at 4–5. The Court disagrees.

Under Article III of the United States Constitution, federal courts may adjudicate only actual "cases" and "controversies." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1223 (11th Cir.2004) (citation omitted). While the case-or-controversy requirement encompasses a number of considerations, Defendant Essex appears to invoke only the standing doctrine in its Motion to Dismiss.

■ As the Supreme Court has described standing, it is, "in essence the question of ... whether a litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). To establish standing, a party must allege facts showing the following: "1) an injury in fact or an invasion of a legally protected interest; 2) a direct causal relationship between the injury and the challenged action; and 3) a likelihood of redressability." *Midrash Sephardi*, 366 F.3d at 1223 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d

351 (1992) and *Pittman v. Cole*, 267 F.3d 1269, 1282–85 (11th Cir.2001)). For purposes of making the standing inquiry, courts must " 'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.' " *Id.* (quoting *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. 2197).

■ In the Second Amended Class Action Complaint [D.E. 47] in the pending matter, Plaintiff E.T. asserts that it has entered into a commercial general liability insurance policy with Defendant Essex. *See* D.E. 47 at 10. E.T. further pleads that it processes credit card transactions and has been sued for alleged violations of the FACTA, attaching a copy of the pending lawsuit filed against it by Chavoustie. *See id.* at 11 and D.E. 47–5. Because Defendant Essex has denied insurance coverage in the "FACTA lawsuits," E.T. claims, E.T. has suffered "damages (comprised of costs, attorney's fees, settlement sums, and judgments)," and "the FACTA lawsuits could easily force the Plaintiffs ... out of business since any individual case could result in many thousands, if not, millions of dollars in damages." *Id.* at 11, 12, 14; *see also id.* at 32, 35. The Second Amended Class Action Complaint directly alleges that Plaintiffs, including E.T., have incurred such damages "as a result of the Defendants' ... denials of coverage in connection with the FACTA lawsuits." *Id.* at 14.

Creative or any of the members of the putative class exists. Nevertheless, if such a relationship does exist, nothing in the Second Amended Class Action Complaint indicates that it would be any different from the relationship between Essex and E.T. Consequently, if Defendant Essex's Motion to Dismiss is granted against E.T., the Motion to Dismiss should be granted in its entirety. If, on the other hand, Defendant Essex's Motion to Dismiss is denied, Defendant Essex's contention

that no case or controversy exists with respect to Plaintiff Creative or any of the putative class members, requires further briefing, perhaps at the class certification stage. Because the issue of class certification has not yet been briefed, I do not offer recommendations regarding these matters. Instead, this Report and Recommendation considers simply the sufficiency of Plaintiff E.T.'s claims against Defendant Essex and Plaintiff Creative's claims against Defendant USLI.

Taken at fact value, as the Court must, these allegations establish an injury in fact in the form of damages stemming from having to defend and possibly pay a judgment on the underlying lawsuit. They also demonstrate a direct causal relationship between the injury in fact—damages—and the challenged action—denial of insurance coverage. As for redressability, the Second Amended Class Action Complaint in this matter seeks a declaration that Defendant has a duty to defend the FACTA lawsuits (including *Chavoustie* ) and indemnify E.T., and further, that E.T. is entitled to an award of damages arising out of Defendant Essex's refusal to defend and indemnify E.T. in the *Chavoustie* litigation. *See* D.E. 47 at 33, 36. Should the Court grant such relief, that remedy would redress the injury in fact of which Plaintiff E.T. complains. Consequently, the Court concludes that Defendant Essex's Motion to Dismiss as it raises a case-or-controversy argument against Plaintiff E.T. should be denied.

### B. Insurance Policy Coverage

Both Defendants USLI and Essex challenge Plaintiffs' assertions that their respective insurance policies cover violations of the FACTA as pled in the *Turner* and *Chavoustie* cases. Since Plaintiffs premise jurisdiction in this case on diversity grounds, the Court must determine the law applicable to this matter by looking to Florida's choice-of-law rules. *Adolfo House Distributing Corp. v. Travelers Property and Casualty Ins. Co.,* 165 F.Supp.2d 1332, 1335 (S.D.Fla.2001) ("*Adolfo House* ") (citing *LaFarge Corp. v. Travelers Indem. Co.,* 118 F.3d 1511, 1515 (11th Cir.1997); *Bituminous Casualty Corp. v. Advanced Adhesive Technology, Inc.,* 73 F.3d 335, 337 (11th Cir.1996))). In consulting Florida's laws, the Court first considers rulings of Florida's Supreme Court. *See Bailey v. Southern Pacific Transp. Co.,* 613 F.2d 1385, 1388 (5th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 109, 66 L.Ed.2d 42 (1980). Where the highest court in the state has rendered no decisions on point, however, this Court must follow the opinions of Florida's intermediate courts, unless it is "convinced that the highest court would decide otherwise." *Id.* (citing *Commissioner v. Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967)).[5]

■ As Florida law pertains to choice of law in the context of contract interpretation, the Florida Supreme Court has "long adhered" to the rule of *lex loci contractus. State Farm Mut. Auto. Ins. Co. v. Roach,* 945 So.2d 1160, 1163 (Fla.2006). In the context of insurance contracts, that rule provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage. *Id.* (citing *Sturiano v. Brooks,* 523 So.2d 1126, 1129 (Fla.1988)). The place where the contract was executed is "generally considered to be the place where the policy is delivered." *Adolfo House,* 165 F.Supp.2d at 1335 (citing *Sturiano v. Brooks, supra,* and *Bloch v. Berkshire Ins. Co.,* 585 So.2d 1137 (Fla.3d Dist.Ct.App. 1991)).

Here, the commercial general liability policies in controversy were issued to Florida policy holders, and Plaintiff insureds' businesses are physically located in Florida. *See* D.E. 47 at 2; D.E. 47–2 at 1 (showing Florida mailing address for Creative and indicating, "This insurance is issued pursuant to the Florida Surplus Lines Law . . . ."); D.E. 47–3 at 1 (showing Florida mailing address for ET's insured restaurant and indicating, "This insurance

**5.** Pursuant to *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

is issued pursuant to the Florida Surplus Lines Law...."), 7. Moreover, the policies refer to "Florida changes," *see, e.g.,* D.E. 47–2 at 21; D.E. 47–3 at 35, and all parties suggest that Florida law governs interpretation of the contested insurance policies. *See, e.g.,* D.E. 18 at 6 ("Construction of an insurance contract and the determination of whether Florida law requires the insurer to provide coverage are questions of law."); D.E. 24 ("Florida follows the 'four corners rule'...."); D.E. 25 at 5 ("The general insurance law of Florida...."). Thus, Florida law governs construction of the insurance policies at issue.

In this case Creative and E.T. claim that under their respective insurance policies with USLI and Essex, USLI and Essex owe Creative and E.T. a duty to defend and indemnify Creative and E.T. in the *Turner* and *Chavoustie* lawsuits, respectively. *See* D.E. 47 at 3 n. 1 and at 12, Counts I, II. Consequently, the Court begins with a review of Florida law as it pertains to the duties to defend and indemnify.

Under Florida law, the duty to defend, which can exist only by statute or contract, constitutes a responsibility separate and apart from the duty to indemnify. *Allstate Ins. Co. v. RJT Enterprises, Inc.,* 692 So.2d 142, 143 (Fla.1997). In this respect, the duty to defend is broader than the insurer's duty to indemnify, and the insurer is bound to defend even if the allegations in the complaint are factually incorrect or entirely without merit. *Jones v. Fla. Insurance Guaranty Association, Inc.,* 908 So.2d 435, 443 (Fla.2005).

■ Florida courts evaluate whether a duty to defend exists by looking to the underlying complaint. *Id.* at 442–43. More specifically, "an insurer's duty to defend its insured against a legal action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage." *Id.* (citations omitted). Thus, " '[w]hen the actual facts are inconsistent with the allegations in the complaint, the allegations in the complaint control in determining the insurer's duty to defend.' " *Id.* at 443 (quoting *Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.,* 470 So.2d 810, 813 (Fla. 1st Dist.Ct.App.1985)). Similarly, if the complaint avers facts showing more than one basis for liability—one falling within the insurance coverage and the others, outside—the insurer must defend the entire suit. *Baron Oil Co.,* 470 So.2d at 813–14; *Sunshine Birds and Supplies, Inc. v. U.S. Fidelity and Guaranty Co.,* 696 So.2d 907, 910 (Fla.3d Dist.Ct.App.1997). In fact, the duty to defend continues although, ultimately, the alleged cause of action is found to be groundless and, therefore, no liability within the policy provisions defining coverage is held to exist. *See New Amsterdam Casualty Co. v. Knowles,* 95 So.2d 413 (Fla.1957). In applying these rules, where the allegations in the complaint leave any doubt regarding the duty to defend, courts must resolve the question in favor of the insured, requiring the insurer to defend. *Jones,* 908 So.2d at 444 (citations omitted).

Nevertheless, courts do not determine the duty to defend solely by reference to the complaint's wording, without regard to the bigger picture. *Keen v. Fla. Sheriffs' Self–Insurance Fund,* 962 So.2d 1021, 1024 (Fla. 4th Dist.Ct.App.2007) (citations omitted). In this respect, "buzz words" alone in a complaint cannot trigger coverage when the cause of action in the underlying complaint pertains to a non-covered act. *Id.* (quoting *Amerisure Ins. Co. v. Gold Coast Marine Distribs., Inc.,* 771 So.2d 579, 582 (Fla. 4th Dist.Ct.App.2000)). Consequently, the Court reviews the *Turner* and *Chavoustie* complaints to ascertain what they allege, comparing the allegations to the language of the insurance policies at issue in this matter.

### 1. The Chavoustie Complaint

The *Chavoustie* complaint alleges violations of 15 U.S.C. § 1681c(g), but it does not expressly specify whether the *Chavoustie* plaintiffs seek a finding of liability under 15 U.S.C. § 1681n (willful noncompliance) or under 15 U.S.C. § 1681o (negligent noncompliance). It, nevertheless, appears as though the *Chavoustie* plaintiffs intended to allege willful noncompliance. In this regard, some of the specific factual allegations in the complaint allege that E.T. "willfully or recklessly violated the requirements of FACTA." *See, e.g.,* D.E. 47–5 at 13, 11, 12.

Despite this appearance, however, the *Chavoustie* complaint itself invokes neither Section 1681n nor Section 1681o. Moreover, it articulates the following questions of law and fact purportedly common to the putative class:

(i) Whether the Merchant accepts credit cards or debit cards for the transaction of business.

(ii) Whether the Merchant violated FACTA by printing more than the last five digits of the credit card or debit card's account number or the expiration date upon any receipt provided to the Cardholder.

(iii) Whether the Merchant's sole means of recording the payment card's account number or expiration date is by handwriting or by an imprint or copy of the credit or debit card.

(iv) Whether the Merchant willfully failed to comply with the requirements imposed by FACTA.

D.E. 47–5 at 5. Under this formulation, if the fact finder concluded in favor of the *Chavoustie* plaintiffs on every question above except the last one, E.T. could still be found liable for negligently violating Section 1681c(g) if any of the *Chavoustie* plaintiffs subsequently proved the individual question of actual damages. In fact, the relief that the *Chavoustie* plaintiffs seek includes, among other aspects, a judgment for "any actual damages sustained by the Cardholders as a result of the Merchant's violation of FACTA...." D.E. 47–5 at 10. Both sections 1681n and 1681o authorize recovery of actual damages. Thus, although the *Chavoustie* complaint also requests other relief available exclusively under Section 1681n, the potential causes of action alleged by the *Chavoustie* complaint can fairly be read to include both negligent and willful noncompliance with 15 U.S.C. § 1681c(g). Because the duty to defend arises whenever a complaint, when fairly read, alleges facts that create *potential* coverage under the insurance policy, *see Jones,* 908 So.2d at 442–43, should E.T.'s insurance policy with Essex cover the facts alleged in *Chavoustie*—that is, negligent or willful noncompliance with FACTA's electronic credit card receipt redacting and truncating provisions, E.T. must defend Essex in the *Chavoustie* action. *See, e.g., Sunshine Birds and Supplies, Inc. v. U.S. Fidelity and Guaranty Co.,* 696 So.2d 907, 910 (Fla.3d Dist.Ct.App.1997) (where plaintiff in underlying complaint alleged facts claiming both that insureds had actual and constructive knowledge of their employees' proclivity to molest children, intentional acts exclusion barring coverage for actual knowledge did not preclude coverage for constructive knowledge); *see also, e.g., Vector Products, Inc. v. Hartford Fire Ins. Co.,* 397 F.3d 1316 (11th Cir.2005) (where plaintiff in underlying complaint alleged facts supporting both claims for which knowledge or intent was a required element and claims in strict liability, insurer had duty to defend, even though intentional acts exclusion barred coverage of claims for which knowledge or intent was a required element); *Hartford Accident & Indem. Co. v. Beaver,* 466 F.3d 1289, 1297 (11th Cir.2006) ("[S]o long as the complaint can reasonably be read as alleging that the

class members' injuries were negligently caused, even if it also may arguably be read as alleging that the injuries were intentionally caused, the doubt must be resolved in favor of finding a duty to defend.") (citing *Sunshine Birds & Supplies, Inc. v. U.S. Fid. & Guar. Co.*, 696 So.2d at 910).

### 2. The Turner Complaint

Similar to the *Chavoustie* complaint's charges against E.T., the *Turner* complaint alleges that Creative violated the FACTA when it provided its customers with electronically printed receipts bearing the expiration dates of its customers' payment cards. *See* D.E. 47-5 at 4. Unlike *Chavoustie,* however, *Turner* expressly seeks damages only pursuant to 15 U.S.C. § 1681n (willful noncompliance). *See* D.E. 47-4 at 6 ("Plaintiff ... does not seek to quantify or recover actual damages in this case ...."), 11 (seeking statutory and punitive damages, as well as attorney's fees, under 15 U.S.C. § 1681n). Therefore, USLI is bound to provide coverage to Creative only if the policy under consideration covers willful noncompliance with FACTA's electronic credit card receipt expiration-date-redacting provision, as alleged in *Turner.*

### 3. The Insurance Policies at Issue

Now that the Court has reviewed the allegations contained in the *Chavoustie* and *Turner* complaints, the Court considers the language of the insurance policies invoked by Plaintiffs to determine whether the facts alleged in the *Chavoustie* and *Turner* complaints fall under the umbrella of coverage contracted for by those policies. Both Creative and E.T. claim coverage under the identical language in their respective insurance policies with USLI and Essex:

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply....

\* \* \* \* \*

**SECTION V  DEFINITIONS**

\* \* \* \* \*

14. "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

\* \* \* \* \*

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

\* \* \* \* \*

D.E. 47 at 25; D.E. 47-2 at 7, 16; D.E. 47-3 at 22, 30.

Defendants, however, contest coverage, arguing that (1) printing and giving a payment card receipt to the payment card holder does not constitute "publication" under the insurance policies; (2) the underlying complaints allege nothing qualifying as an "injury" under the insurance policies, as any "injury" alleged pertains to speculative claims of harm in the future resulting from the claimed FACTA violations; (3) the statutory damages sought by the *Chavoustie* and *Turner* plaintiffs constitute punitive and exemplary damages, the coverage of which is precluded by endorsements to the insurance policies at issue; (4) the policies' exclusions for intentional acts excludes coverage for the acts alleged in *Chavoustie* and *Turner;* and (5)

the policies' exclusions relating to the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), and the Controlling the Assault of Non-solicited Pornography and Marketing Act of 2003, 15 U.S.C. §§ 7701, et seq. ("CAN–SPAM").

■ Before addressing these specific points, the Court first notes some of the principles of interpretation controlling Florida insurance contract law. "Insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties, and ambiguities are interpreted liberally in favor of the insured and strictly against the insurer who prepared the policy." *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So.2d 176, 179 (Fla. 4th Dist.Ct.App.1997) (citing *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So.2d 467 (Fla.1993)). In this respect, coverage provisions are "construed in the broadest possible manner to effect the greatest extent of coverage." *Id.* (citing *Hudson v. Prudential Prop. & Cas. Ins. Co.*, 450 So.2d 565, 568 (Fla.2d Dist.Ct.App.1984); *Nat'l Merchandise Co. v. United Serv. Auto. Ass'n*, 400 So.2d 526, 532 (Fla. 1st Dist. Ct.App.1981); *Valdes v. Smalley*, 303 So.2d 342, 344 (Fla.3d Dist. Ct.App.1974); *Hartnett v. Southern Ins. Co.*, 181 So.2d 524, 528 (Fla.1965)). Consequently, " 'when an insurer fails to define a term in a policy, ... the insurer cannot take the position that there should be a "narrow, restrictive interpretation of the coverage provided." ' " *State Farm Fire and Cas. Co. v. CTC Development Corp.*, 720 So.2d 1072, 1076 (Fla.1998) (citations omitted).

### a. "Publication"

■ In considering the meaning of the term "publication" in the policy language at issue, the Court first notes that the policy does not define the word. Defendants, therefore, urge the Court to adopt the definition in *Webster's Revised Unabridged Dictionary* or *Black's Law Dictionary*, under which Plaintiffs' provisions of payment card receipts to only the respective payment card holders would not qualify as "publication" because such actions do not involve "some form of *public* dissemination." *See* D.E. 18 at 9–10 (emphasis added). Defendants similarly argue that the alleged publication in *Chavoustie* and *Turner*—the insured's production to the payment card holder of the payment card receipt containing the information in violation of the FACTA—cannot constitute "publication" as that term is understood under Florida common-law causes of action, Florida statutory causes of action, Florida common law, or Florida statutes. *See* D.E. 54 at 5. More specifically, Defendants refer to the idea of "publication" within the confines of the cause of action for defamation, correctly noting that in order for defamation to be actionable, a defamatory comment must be made to someone other than the person allegedly defamed, and the purportedly defamed party must not be the one who made the statement. *See id.* at 5–6 (citations omitted); D.E. 55 at 6. In the same vein, Defendants argue that the sharing of a payment card receipt with the payment card holder alone does not violate any privacy rights under Florida law.[6] D.E. 54 at 6.

---

**6.** Alternatively, Defendants suggest that the Court look to the policy's definition of "advertisement" for guidance in understanding the meaning of "publication." The policy defines "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." D.E. 47–3 at 28.

This idea does not assist the Court, however, as the definition of "personal and advertising injury" does not necessarily require a covered injury to be incurred as a result of an "advertisement." Indeed, injuries covered under the definition of "personal and advertising injury" include, among others, "injury, including consequential 'bodily injury,' arising

The problem with all of these contentions, however, stems from the fact that the policy language itself renders them unjustifiedly narrow in that it covers "[o]ral or written publication, *in any manner.*" D.E. 47–3 at 30 (emphasis added). Under Florida law, "tort law principles do *not* control judicial construction of insurance contracts." *FCCI Ins. Co. v. Horne,* 890 So.2d 1141, 1143 (Fla. 5th Dist.Ct.App. 2004) (emphasis in original) (citing *Prudential Property & Cas. Ins. Co. v. Swindal,* 622 So.2d 467 (Fla.1993)). Rather, Florida law requires courts to interpret contracts in such a way as to give effect to every provision, if possible. *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So.2d 938, 941 (Fla.1979). As a result, the addition of the words "in any manner" to the term "publication" should have some function. Here, the words clarify the scope of the meaning of "publication."

In considering the breadth of the phrase, "publication, in any manner," the Court finds it difficult to conceive of a more inclusive description of the categories of "publication" to be covered by an insurance policy, particularly in light of Florida's insurance policy construction canon requiring courts to interpret coverage clauses "in the broadest possible manner to [e]ffect the greatest extent of coverage," *Westmoreland,* 704 So.2d at 179 (Fla. 4th Dist.Ct.App.1997) (citing *Hudson v. Prudential Prop. & Cas. Ins. Co.,* 450 So.2d 565, 568 (Fla.2d Dist.Ct.App.1984);

*Nat'l Merchandise Co. v. United Serv. Auto. Ass'n,* 400 So.2d 526, 532 (Fla. 1st Dist. Ct.App.1981); *Valdes v. Smalley,* 303 So.2d 342, 344 (Fla.3d Dist.Ct.App.1974); *Hartnett v. Southern Ins. Co.,* 181 So.2d 524, 528 (Fla.1965)), and putting insurers on notice that " 'when an insurer fails to define a term in a policy, ... the insurer cannot take the position that there should be a "narrow, restrictive interpretation of the coverage provided." ' " *State Farm Fire and Cas. Co. v. CTC Development Corp.,* 720 So.2d 1072, 1076 (Fla.1998) (citations omitted). Had Defendants wished to restrict the definition of "publication" to be narrowed to the meaning of that term under Florida defamation law or to be otherwise qualified, Defendants bore the burden of articulating that limitation. *See Adolfo House,* 165 F.Supp.2d at 1340. The policies now before the Court do not do that. "Having failed to do so, [Defendants] cannot now ask the court to rewrite the policy for [them] under the guise of policy construction." *Id.*

Consequently, the Court must consider whether any reasonable calculus of "publication" can include within it the conduct at issue here, that is, Plaintiffs' provision to a payment card holder of a receipt bearing that payment card holder's card expiration date and more than five digits of that payment card holder's account number. The Court concludes that it can.

Several courts have discussed the boundaries of "publication." In *Zurich*

out of ... [f]alse arrest, detention or imprisonment[,][m]alicious prosecution[,] [and] [t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor...." Nothing in these descriptions requires that such injuries be incurred as a result of an "advertisement." As the phrase "personal and advertising injury" does not require or even suggest that such injury must be inflicted in connection with an

"advertisement," as defined under the policy, consulting the definition of "advertisement" to determine the meaning of "publication" under the definition of "personal and advertising injury" would result in an unwarranted overly narrow construction of the phrase. Moreover, consulting "advertisement" to discern the meaning of "publication" suffers from the same weaknesses as Defendants' other proposed constructions of the term. *See infra.*

*American Ins. Co. v. Fieldstone Mortgage Co.*, 2007 WL 3268460, *5 (D.Md. Oct. 26, 2007) ("*Zurich*") (citing *Park Univ. Ent., Inc. v. American Cas. Co. of Reading*, 442 F.3d 1239, 1248–49, 1250 (10th Cir.2006)), the court concluded that "the majority" of courts to ponder the meaning of "publication" in the context of an "advertising injury" provision have found that publication need not be to a third party. *See also, e.g., Western Rim Investment Advisors, Inc. v. Gulf Ins. Co.*, 269 F.Supp.2d 836, 846–47 (N.D.Tex.2003) (noting that "[a]n invasion-of-privacy claim based on intrusion upon seclusion … does not require that its factual underpinnings include an allegation of publication to a third party.").

Moreover, the *Zurich* Court opined, "publication" carries no necessary connotation that it involves disclosure to a person with "previous ignorance" of the matter subject to "publication." *Supra*, 2007 WL 3268460 at *5. In *Zurich*, the plaintiff in the underlying complaint received prescreened offers from the insured to refinance the plaintiff's mortgage. In the underlying complaint, the plaintiff alleged that Fieldstone Mortgage Co. ("Fieldstone"), the insured, prescreened based on information contained in the plaintiff's consumer credit report, which, according to the underlying complaint, Fieldstone had accessed without the consent of the plaintiff and without a permissible purpose under the Fair Credit Reporting Act ("FCRA"). After service of the lawsuit, Fieldstone requested coverage under its insurance policy with Zurich, the insurer, invoking the very same language within its policy that is at issue in this case. Zurich denied coverage, arguing, among other positions, that no "publication" occurred. The court disagreed, explaining that by sending the plaintiff a prescreened letter containing his personal information such as his name, address, and certain credit information, Fieldstone had engaged in "publi-

cation" under the insurance policy. *See id.* at *6.

The instant case is materially indistinguishable. By *Zurich's* definition of "publication," like Fieldstone when it sent the plaintiff a letter containing the plaintiff's private information that the plaintiff already knew, E.T., as alleged in the *Chavoustie* complaint, and Creative, as claimed in the *Turner* complaint, participated in "publication" of the *Chavoustie* and *Turner* plaintiffs' protected payment card information when they provided receipts to only the cardholders in those cases, even though the cardholders already were aware of the information printed on the receipts.

Moreover, whether this Court agrees with the *Zurich* Court's explanation of the term "publication" in the policy language at issue in both *Zurich* and the instant case matters not. Rather, the very existence of the *Zurich* analysis demonstrates the reasonableness of E.T. and Creative's urged construction of the word. Although in the context of considering an award of fees under the Equal Access to Justice Act, the Eleventh Circuit has indicated that a party's position is "reasonable[ ] in law and fact" when case law exists to support it. *See Enerhaul, Inc. v. Nat'l Labor Relations Board*, 710 F.2d 748, 751 (11th Cir.1983). The Court can discern no reason to apply a different standard here, where the policy language so broadly defines "publication" to include "publication, in any manner." Because at least some case law supports Plaintiffs' proposed interpretation of "publication," the Court finds Plaintiffs' inclusive definition of the term to be a reasonable one.

Nor, as Defendants urge, does *Whole Enchilada, Inc. v. Travelers Prop. Cas. Co.*, 581 F.Supp.2d 677 (W.D.Pa.2008), suggest a different outcome. Although *Whole Enchilada* involved a claim for in-

surance coverage by a company sued for violations of the FACTA, in *Whole Enchilada*, the policy at issue in that case differed significantly from the one involved in the instant matter. More specifically, the *Whole Enchilada* policy provided coverage for damages sustained because of "personal injury," "advertising injury," or "web site injury." *See id.* at 685. The insured sought coverage under the definitions of "advertising injury" and "personal injury." Pursuant to the policy, "advertising injury" included "[o]ral, written or electronic publication of material that appropriates a person's likeness, unreasonably places a person in a false light or gives unreasonable publicity to a person's private life," while "personal injury" covered "injury, other than 'bodily injury' arising out of ... [o]ral, written or electronic publication of material that appropriates a person's likeness, unreasonably places a person in a false light or gives unreasonable publicity to a person's private life." *Id.*

Here, however, Plaintiffs seek coverage for "personal and advertising injury," which is further defined as including "[o]ral or written publication, in any manner, of material that violates a person's right to privacy." A comparison of the plain language of the two policies readily reveals material differences. Indeed, even the *Whole Enchilada* Court recognized this fact when it distinguished "case law ... [standing for the proposition] that publicity does not necessarily require some type of dissemination to the public ...," at least in part on the basis of the different policy language involved in the various cases. *See id.* at 700. In discussing these differences, the court observed, "[T]he policy language at issue [in *Zurich*] provided coverage for personal injury 'arising out of ... oral or written publication, *in any manner*, that violates a person's right of privacy.'" *Id.* (quoting *Zurich*, 2007 WL 3268460 at *1) (emphasis added by *Whole Enchilada* Court). Thus, the definition of

"publication" employed by *Whole Enchilada* does not render wrong the more expansive construction of the phrase "publication, in any manner."

Moreover, even if, ultimately, the more restrictive definition of "publication" is adopted by Florida courts interpreting the policy language at issue, that would not change the reasonableness of Plaintiffs' proposed construction of the phrase "publication, in any manner" now. As previously discussed, the fact that some courts have interpreted the phrase in a manner consistent with that urged by Plaintiffs, and no legal authority at this time renders those rulings abrogated, makes Plaintiffs' proposed construction a reasonable one. As such, it falls within the realm of permissible interpretation of the coverage provisions, which must be "construed in the broadest possible manner to effect the greatest extent of coverage." *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So.2d 176, 179 (Fla. 4th Dist.Ct.App.1997).

Here, the *Chavoustie* and *Turner* complaints allege publication falling within the description of "publication, in any manner," set forth in the insurance policies under review. More specifically, the *Chavoustie* complaint claims that E.T. "print[e]d more than the last five digits of the card number and/or the expiration date on the consumer receipts it provided to [Chavoustie] and the purported class," D.E. 47–5 at 11; *see also id.* at 13, and the *Turner* complaint asserts that Creative "provided [Turner] with an electronically printed receipt bearing the expiration date of [Turner's] credit/debit card account on July 1, 2008." D.E. 47–4 at 14. As these allegations claim that Plaintiffs provided written information to the respective cardholders in the form of an electronic receipt, these contentions adequately assert "publication, in any manner," as that phrase may be reasonably construed, as discussed previously.

### b. "Injury"

■ Next, Defendants contend that the policies do not provide coverage because neither the *Chavoustie* plaintiffs nor the *Turner* plaintiffs have alleged an "injury" within the meaning of the policies. In this regard, Defendants argue that the *Turner* complaint avers only that the FACTA violations "had the *potential* to cause injury, in the form of greater exposure to identity theft ...," not that they actually caused injury. D.E. 18 at 11. Essex similarly argues that the *Chavoustie* complaint alleges no injury cognizable under the policy, but Essex contends that this is so because the *Chavoustie* complaint does not claim a "bodily injury," "property damage," an "advertising injury," or a "personal injury." *See* D.E. 24 at 9–14.

These contentions miss the mark. Plaintiffs argue that the policies' definition of "personal and advertising injury"—not "bodily injury," "property damage," "advertising injury," or "personal injury"— encompasses the injury alleged by Chavoustie and Turner in their complaints. "Personal and advertising injury" contemplates a different type of injury than "bodily injury," "property damage," "advertising injury," or "personal injury," to the extent that any of those terms may be defined by the applicable insurance policies.[7] *Compare, e.g.,* definitions of "[b]odily injury," D.E. 47–3 at 28, and "[p]roperty

damage," D.E. 47–3 at 30, *with* definition of "[p]ersonal and advertising injury," D.E. 47–3 at 30. More specifically, under the plain language of the policies, "personal and advertising injury" necessarily includes violations of "a person's right of privacy." Consequently, whether the *Chavoustie* and *Turner* plaintiffs alleged actual identity theft, bodily injury, property damage, advertising injury, or personal injury carries no significance if they pled factual allegations demonstrating that Creative and E.T.'s provision of electronically printed payment card receipts to the payment card holders violated some "right of privacy."

The Court, therefore, must consider the meaning of the phrase "right of privacy" appearing in the insurance policies under consideration. In so doing, the Court begins by observing that the phrase "right of privacy" is not defined anywhere in the policies. Nor does any part of the policies appear to qualify or limit in some way the meaning of "right of privacy." Thus, the Court must endow the phrase "right of privacy" with its ordinary, reasonable meaning. As the Eleventh Circuit has opined, where an insurance policy does not define "privacy," "it is ... reasonable to interpret 'privacy' ... broadly to include aspects of privacy protected by ... sources of law[] including state privacy statutes and federal law." *Hooters of Augusta, Inc. v. American Global Ins. Co.,* 157 Fed.Appx. 201, 205 (11th Cir.2005).[8]

---

**7.** The phrases "advertising injury" and "personal injury" are not defined in the insurance policies before the Court. In other cases where the insurance policies do define these terms separately, as opposed to defining them together as "personal and advertising injury," as the pending policies do, it is clear that one cannot arrive at the meaning of "personal and advertising injury" simply by combining the definitions of each of the broken out terms. *See, e.g., Whole Enchilada,* 581 F.Supp.2d at 684–87 (setting forth policy language containing the definitions of "personal

and advertising injury," "personal injury," and "advertising injury," and noting the insurer's argument that the policy drafters replaced "personal and advertising injury" with the separate definitions for "personal injury" and "advertising injury," which rendered the definition of "personal and advertising injury" under which the *Whole Enchilada* plaintiff sought coverage inapplicable.).

**8.** While this case is not published, and, thus, does not bind this Court, the Court finds it persuasive and instructive, nonetheless.

This is because ambiguous provisions within an insurance contract must be construed in favor of greater coverage for the insured. *See id.* at 206–07.[9]

While rights of privacy may derive from different sources, in this case, Creative and E.T. suggest that the FACTA creates the *Chavoustie* and *Turner* plaintiffs' right of privacy allegedly violated by Creative and E.T.'s provision to payment card holders of electronically printed receipts bearing information from the respective payment card holders' cards that should have been redacted under FACTA. *See* D.E. 25 at 5–7. Accordingly, the Court reviews the FACTA and its legislative history to determine whether the FACTA established a right of privacy for payment card holders in their payment card information that is required to be redacted from electronically printed payment card receipts. I recommend a finding that it did.

Perhaps President George W. Bush explained the purpose of the truncation provisions of the FACTA best when, upon signing the FACTA, he commented, "Slips of paper that most people throw away should not hold the key to their savings and financial secrets." Statement by President George W. Bush Upon Signing H.R. 2622, 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003). To remedy this problem, as well as others, President Bush clarified, the government, through enactment of the FACTA, was "act[ing] to protect individual privacy." *Id.* Indeed, as United States Representative John B. Shadegg described part of the solution to epidemic levels of identity theft[10] intended to be remedied by the FACTA, "[T]he bill requires that any time a transaction is made and information is transmitted using a credit card number, that number has to be truncated so that someone who wants to steal your identity by grabbing ahold of your credit card number will not have the full number." 149 Cong. Rec. H8111–01 (statement of Rep. Shadegg). Other legislators echoed the anti-identity theft purposes of the FACTA. *See, e.g.,* 149 Cong. Rec. H8122–02 (statement of Rep. Jackson–Lee) ("This bill . . . will include comprehensive identity theft . . . provisions); H.R. Conf. Rep. No. 396, 108th Cong., 1st Sess. (2003) (statement of Rep. Oxley) ("One of the central elements of [the FACTA bill] was to make the new fraud prevention . . . contained in the legislation the new uniform national standards on those subject matters. The bill was drafted in this way because identity theft is a national concern . . . .").

This review of the legislative history elucidates that the truncation provisions of the FACTA arose from a desire to prevent identity theft that can occur when card holders' private financial information, such as a card holder's complete credit card number, is exposed on electronically printed payment card receipts. In other words, and as President Bush suggested, the truncation provisions of the FACTA were intended to protect the secrecy, and, thus, the privacy of card holders' complete payment card account numbers and information. Indeed, courts have recognized as a "species of privacy violation . . . violations of a right to secrecy of personal information. . . ." *Hooters of Augusta, Inc. v.*

Moreover, its very existence demonstrates that it is reasonable for Plaintiffs to urge a construction of "right of privacy" that includes federal rights of privacy.

9. Although *Hooters* is decided under Georgia law, the same concept applies under Florida law. *See Penzer v. Transp. Ins. Co.,* 545 F.3d

1303, 1308 (11th Cir.2008); *see also supra* at 13.

10. In the year preceding enactment of the FACTA 10 million people reported being victims of identity theft. 149 Cong. Rec. H8111–01 (statement of Rep. Shadegg).

*American Global Ins. Co.,* 157 Fed.Appx. 201, 208 (11th Cir.2005) (citing *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.,* 407 F.3d 631, 640–41 (4th Cir.2005); *Am. States Ins. Co. v. Capital Assocs. of Jackson County, Inc.,* 392 F.3d 939, 942–43 (7th Cir.2004)). By enacting a law designed to protect the privacy of card holders' complete payment card account numbers, Congress, at the very least, recognized a card holder's right of privacy in the card holder's complete card account number and account information, and a corresponding right of privacy not to have that information exposed on an electronically printed payment card receipt.

The Court is not persuaded to the contrary by *Whole Enchilada.* In *Whole Enchilada, supra,* the Western District of Pennsylvania opined that no violation of a privacy right occurred when a merchant violated the truncation provisions of the FACTA and gave its customer an electronically printed receipt that identified the card holder's complete card account number. *Id.,* 581 F.Supp.2d at 699–700. In reaching this conclusion, the court reasoned that the FACTA does not preclude a merchant from obtaining credit information from the consumer, as the Fair Credit Reporting Act does. *Id.* at 699. Further explaining its position, the court stated that no violation of a right of privacy could occur where the customer "willfully" disclosed the card's complete number to the merchant so the merchant could use the information to process the sale. *Id.* at 700. The court concluded that "[t]his factual scenario does not meet the requirement of publicity under the policies." *Id.*

Thus, the *Whole Enchilada* Court relied, in part, in finding no right of privacy, on the definition of "publication" in the policies at issue in that case. As described above, however, the *Whole Enchilada* policies employed different language regarding coverage for "publication" than the

policies under consideration in the case before this Court. Moreover, to the extent that *Whole Enchilada* may be read to suggest that the FACTA did not recognize a right of privacy in not having a complete card account number identified on an electronically printed receipt, even where the card holder disclosed the complete card account number to the merchant who electronically printed the receipt, I respectfully disagree. To the contrary, the entire purpose of the truncation provisions is to avoid having electronically printed payment card receipts, or "[s]lips of paper that most people throw away[,] ... hold[ing] the key to [the card holders'] savings and financial secrets." Statement by President George W. Bush Upon Signing H.R. 2622, 39 Weekly Comp. Pres. Doc. 1746, 1757 (Dec. 4, 2003). Put simply, the truncation provision seeks to protect the privacy of a card holder's financial secrets. Thus, the fact that the card holder voluntarily provided the card to the merchant for payment has no bearing on the privacy interest at stake—an interest in avoiding disclosure of the complete card account number information on the electronically printed receipt, which, as a practical matter and as the legislature attempted to remedy, frequently results in identity theft and fraud.

In view of the existence of a right of privacy in not having complete payment card account numbers and account information appear on electronically printed receipts, the Court must consider whether the *Chavoustie* and *Turner* plaintiffs fairly and potentially asserted allegations demonstrating that Plaintiffs violated this right of privacy of the *Chavoustie* and *Turner* plaintiffs. The Court finds that they did. In *Chavoustie,* the plaintiffs claimed that E.T. "failed to protect [the *Chavoustie* plaintiffs] against identity theft and credit and debit card fraud by printing more than the last five digits of the card number

and/or the expiration date on the consumer receipts it provided to [the *Chavoustie* plaintiffs]." D.E. 47–5 at 11; *see also id.* at 13 (asserting violation of the "requirements of FACTA by printing more than the last five digits of the card number and/or the expiration date on the consumer receipts [that E.T.] provided to [the *Chavoustie* plaintiffs] . . . ."). They further alleged that as a result of E.T.'s alleged failure to truncate on electronically printed payment card receipts, the *Chavoustie* plaintiffs were "aggrieved by [E.T.'s] . . . fail[ure] to comply with the requirements of FACTA." *Id.* at 21; *see also id.* at 22–26.

Similarly, the *Turner* plaintiffs asserted that Creative "provided [the *Turner* plaintiffs] with an electronically printed receipt which displayed, without redaction, the expiration date of said credit or debit card account." D.E. 47–4 at 13; *see also id.* at 14. Moreover, the *Turner* plaintiffs claimed that Creative failed to comply with the FACTA, "thereby improperly subjecting its patrons to identi[t]y theft and credit/debit card fraud. . . ." *Id.* at 8; *see also id.* at 17, 19–22. In this regard, the *Turner* plaintiffs described the FACTA truncation requirements as "concealment requirements on electronically printed receipts. . . ." *Id.* at 20. Finally, the *Turner* plaintiffs averred that they "suffered actual harm" as a result of Creative's alleged failure to comply with the FACTA's truncation requirements. *Id.* at 22. These contentions fairly and potentially bring the *Chavoustie* and *Turner* lawsuits within the coverage of the policies at issue to the extent that the policies cover "personal and advertising injury" resulting from "[o]ral or written publication, in any manner, of material *that violates a person's right of privacy.*" (emphasis added).

*c. Punitive and Exemplary Damages Exclusion*

■ Even if the policy language may, on its face, appear to cover FACTA violations under some circumstances, Defendants urge, the policies provide no coverage here to the extent that the *Chavoustie* and *Turner* plaintiffs seek only statutory damages. *See* D.E. 55 at 13–15. In this respect, Defendant USLI directs the Court to Endorsement L224 (09/05) to the Creative policy. *Id.* at 14. Endorsement L224 (09/05) provides, in relevant part,

> Regardless of any other provision of this policy, this policy does not apply to punitive or exemplary damages.

> If a suit is brought against any insured, and falls within the coverage provided by the policy, seeking both compensatory damages (damages for economic loss and pain and suffering) and punitive or exemplary damages (damages as a means of punishment), no coverage shall be provided by this policy for any costs, interest, defense costs or damages attributable to punitive or exemplary damages.

D.E. 47–2 at 27. The E.T.–Essex policy contains a similar endorsement (ME–001 (01/07)), which states, in pertinent part, "Fines, penalties, and punitive or exemplary damages are not covered under this policy. . . ." D.E. 47–3 at 8. Defendants assert further that statutory damages under the FACTA constitute punitive or exemplary damages. Thus, Defendants contend, the insurance policies do not cover such damages.

Defendants' assertion that the *Turner* plaintiffs seek only statutory damages and not actual damages is correct. *See* D.E. 47–4 at 22 ("Plaintiff . . . does not seek to quantify or recover actual damages in this case. . . . [The *Turner* plaintiffs] demand an award of statutory damages. . . ."). Consequently, if statutory damages under

the FACTA constitute punitive or exemplary damages, Endorsement L224 (09/05) appears to preclude such coverage.

The same cannot be said of the *Chavoustie* complaint, however. As previously described, the *Chavoustie* complaint seeks both actual and statutory damages. *See* D.E. 47–5 at 10 (Plaintiffs "seek a judgment . . . for any actual damages sustained . . . or damages of not less than $100 and not more than $1,000 for each payment card receipt found to be in violation of FACTA, . . . ."). Consequently, even if statutory damages are tantamount to punitive or exemplary damages, that circumstance would not dispense with potential coverage for E.T. because the claim for actual damages would remain.

Therefore, the Court considers only Defendant USLI's position against Plaintiff Creative with regard to the applicability of the policy's exemption for punitive and exemplary damages. As it turns out, the Eleventh Circuit has already spoken to the issue of whether statutory damages under 15 U.S.C. § 1681n constitute punitive damages. In *Harris v. Mexican Specialty Foods, Inc.,* the Eleventh Circuit opined,

> We disagree with the district court that the FCRA's [11] statutory-damages provision is punitive in nature. Prior to the 1996 amendments to the FCRA, the statute permitted victims of willful violations to obtain actual and punitive damages. The current version of FCRA provides that plaintiffs may elect to receive actual damages *or* statutory damages, but not both, and in addition maintains the punitive damages provision. 15 U.S.C. § 1681n(a). Because the FCRA already contains a punitive damages provision and specifies that statuto-

ry damages may only be awarded in lieu of actual damages, the district court erred in concluding that the statutory damages provision is tantamount to a punitive damages provision.

564 F.3d 1301, 1313 (11th Cir.2009) (emphasis in original). As the Eleventh Circuit has rejected the argument that statutory damages under Section 1681n amount to punitive damages, this Court respectfully declines to accept USLI's invitation to conclude otherwise. And, because "exemplary damages" is a synonym for "punitive damages," *see* Black's Law Dictionary 417 (8th ed. 1999) (entry for "exemplary damages" under entry for "damages" directs in its entirety, "See *punitive damages.*"), USLI's contention can fare no better when considering whether statutory damages under Section 1681n equate to exemplary damages.

*d. Willfulness Exclusion*

Next, Defendants maintain that even if the conduct alleged in the *Chavoustie* and *Turner* complaints otherwise meets the definition of "personal and advertising injury" established by the policies, coverage is still precluded because the policies exclude coverage for the knowing violation of rights of another. In this regard, Defendants rely on the following language from their policies with Plaintiffs:

> This insurance does not apply to:
>
> a. Knowing Violation Of Rights Of Another "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."

---

11. The FACTA amended the FCRA (Fair Credit Reporting Act). Title 15, United States Code, Section 1681n sets forth the damages available for a willful violation of the FCRA, as amended, which includes the FACTA. In-

deed, in *Harris,* the Eleventh Circuit considered the constitutionality of Section 1681n's statutory-damages provision as applicable to violations of the FACTA's truncation requirements.

D.E. 47–2 at 8; D.E. 47–3 at 22. With this language in mind, USLI asserts that "the only allegations [in the *Turner* complaint] are for willful, knowing and purposeful violations of FACTA," and further, that the statutory damages that the *Turner* plaintiffs seek, which are the only damages that the *Turner* plaintiffs request, are recoverable only for willful violations of the FACTA. D.E. 18 at 12. Because the policy excludes coverage for injuries caused with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury," Defendant USLI continues, Creative cannot obtain coverage for the *Turner* litigation.

Before analyzing this argument, the Court pauses to note that to the extent that Defendant Essex asserts this same contention in relation to the *Chavoustie* litigation, even acceptance by this Court of that proposition cannot relieve Essex of its duty to defend E.T. Unlike in *Turner,* as discussed previously, the *Chavoustie* plaintiffs do not limit their cause of action to seek recovery for only willful violations of the FACTA, but instead, the *Chavoustie* complaint fairly and potentially also includes alternative claims for negligent violations of the FACTA. Correctly, no one suggests that the exclusion for the knowing violation of rights of others should preclude claims of negligence. As a result, even if the Court were to accept Defendants' contentions that the insurance policies exclude coverage for causes of action asserting willful violations of the FACTA, that circumstance would not relieve Defendant Essex of its obligation to provide coverage to E.T. with respect to the *Chavoustie* litigation because of the claim in *Chavoustie* for negligent violation of the FACTA. *See Baron Oil Co.,* 470 So.2d at 813–14 (where the complaint avers facts showing more than one basis for liability— one falling within the insurance coverage and the others, outside—the insurer must defend the entire suit); *Sunshine Birds and Supplies, Inc.,* 696 So.2d at 910.

Returning to Defendant USLI's assertions that the exclusion for the knowing violation of another's rights precludes coverage for Creative in the *Turner* litigation, the Court begins by briefly surveying Florida law regarding exclusionary provisions within insurance contracts. "[E]xclusion clauses are considered contrary to the fundamental protective purposes of insurance. Thus, courts give a strict interpretation to exclusion clauses." *FCCI Ins. Co. v. Horne,* 890 So.2d 1141, 1143 (Fla. 5th Dist.Ct.App. 2004) (citing *Hrynkiw v. Allstate Floridian Ins. Co.,* 844 So.2d 739 (Fla. 5th Dist. Ct.App.2003); *Purrelli v. State Farm Fire & Cas. Co.,* 698 So.2d 618 (Fla.2d Dist.Ct. App.1997)). As these principles relate to intentional act exclusions such as the one at issue in this case, " '[I]ntentional act exclusions are limited to the express terms of the policies and do not exclude coverage for injuries more broadly deemed under tort law principles to be consequences flowing from the insured's intentional acts.' " *Travelers Indem. Co. v. PCR Inc.,* 889 So.2d 779, 787 (Fla.2004) (quoting *Prudential Prop. & Cas. Ins. Co. v. Swindal,* 622 So.2d 467, 470 (Fla.1993)). Moreover, the burden of demonstrating the applicability of an exclusionary clause falls on the shoulders of the insurer. *See Penzer v. Transp. Ins. Co.,* 545 F.3d 1303, 1309 (11th Cir.2008) (citing *U.S. Concrete Pipe Co. v. Bould,* 437 So.2d 1061, 1065 (Fla.1983)).

Thus, the Court considers the exclusion at issue. By its terms, the exclusion precludes coverage only where the insured engaged in " '[p]ersonal and advertising injury' ... *with the knowledge* that the act would violate the rights of another and would inflict "personal and advertising injury." *See* D.E. 47–2 at 8 (emphasis added). Accordingly, for the exclusion to

apply, USLI must demonstrate that the *Turner* complaint alleges nothing less than that Creative provided its payment card customers with electronically printed receipts bearing non-truncated payment card information with the "knowledge that the act would violate the rights of another" and knowledge "that the act would ... inflict 'personal and advertising injury,'" or violate another's right of privacy.

In examining the *Turner* complaint to make this inquiry, the Court turns first to the cause of action alleged in the underlying complaint. As noted above, the *Turner* plaintiffs proceed on a single theory of willful non-compliance with FACTA's truncation requirements (15 U.S.C. § 1681n). The Supreme Court recently opined on the meaning of "willful" non-compliance under Section 1681n, stating,

> GEICO and Safeco argue that liability under § 1681n(a) for "willfully fail[ing] to comply" with the FCRA goes only to acts known to violate the Act, not to reckless disregard of statutory duty, but we think they are wrong. We have said before that "willfully" is a "word of many meanings whose construction is often dependent on the context in which it appears," ...; and where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well....

*Safeco Ins. Co. v. Burr*, 551 U.S. 47, 56–57, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007) (citations omitted). Under Supreme Court precedent, then, "willful" non-compliance with Section 1681n can encompass not only "knowing" violations, but also "reckless" transgressions, which, by definition and as the *Safeco* discussion implicitly recognizes,

fall short of "knowing" violations. As a result, the cause of action that the *Turner* plaintiffs allege, by its elements, includes the possibility of a finding of liability based on less than a "knowing" violation, and the mere fact that the *Turner* plaintiffs proceed under a theory of willful non-compliance under Section 1681n does not in and of itself necessarily invoke the "knowing violation" exclusion of the insurance provision.

The Court, therefore, considers whether the specific allegations asserted in the *Turner* complaint preclude the possibility of potential recovery on a theory of less than a knowing violation. Specifically, USLI directs the Court to paragraphs 10, 17, and 19–21 of the *Turner* complaint, which make averments such as the following:

> ¶ 17. Despite having direct notice of the requirements of the FACTA, Defendant chose to ignore such notice and disregarded the provisions of the FACTA....
>
> ¶ 19. The foregoing acts and omissions of Defendant, despite first having actual and constructive notice of the FACTA requirements, constitute willful violations of the FACTA....
>
> ¶ 20. Defendant's violations as stated herein, were not an isolated incident or an accidental oversight. Defendant chose to ignore the new account concealment requirements on electronically printed receipts at the point of sale, because Defendant did not wish to incur the additional expense of reprogramming or upgrading its point-of-sale equipment.

D.E. 47-4.[12] Paragraph 20 comes the closest to alleging knowing violation of the

---

**12.** The Court does not quote the allegations from the other cited paragraphs because they basically assert simply "willful violations of the FACTA," which tells us no more than that the *Turner* plaintiffs are proceeding under

Section 1681n's willful non-compliance provision. As previously discussed, that statute imposes liability under its "willfulness" standard for both willful and reckless violations.

FACTA. In this regard, Paragraph 20 impliedly suggests that Creative had knowledge that by providing customers with non-truncated electronically printed receipts, Creative was violating such customers' rights of privacy embodied in the FACTA truncation provisions in that it asserts that Creative made a conscious decision to choose financial savings over compliance with the FACTA and, with it, protection of customers' financial rights of privacy. That, however, does not end the inquiry.

Paragraphs 17 and 19 allege no more than "direct notice" and "actual and constructive notice" of the FACTA requirements. *See* D.E. 47–4 at 17, 19. Notice, whether direct, actual, or constructive, however, does not necessarily equate with knowledge. *See Brody v. Village of Port Chester*, 2007 WL 735022, *6–*7 (S.D.N.Y. Mar. 12, 2007). Therefore, the Court must examine the nature of the notice allegations. The *Turner* plaintiffs aver that Creative received notice in ways like the following:

Upon information and belief, FACTA's requirements were widely disseminated to merchants by Visa, Inc.[,] and MasterCard Worldwide, operators [of] the worldwide electronic payments networks, the Payment Card Industry Security Standards Council, an independent council originally formed by American Express, Discover Financial Services, JCB, MasterCard Worldwide and Visa International.... These organizations notified the merchants, including [Creative], that the FACTA prohibited the printing of more than the last five digits of the credit/debit card number and/or the expiration dates associated with the credit/debit card account and that they were required to comply with the FACTA. In fact, the requirements of the FACTA were widely publicized among merchants.

D.E. 47–4 at 15. These contentions suggest only that the *Turner* plaintiffs may have reason to believe that Creative received notice of the FACTA provisions and, at most, that Creative should have been aware of the FACTA requirements; they do not aver that Creative, in fact, reviewed or otherwise actually became aware of the information contained in the materials alleged to have been provided to Creative, thus, acquiring knowledge of the information. Because these allegations and others within the *Turner* complaint leave open the potential for recovery by the *Turner* plaintiffs for reckless non-compliance with the FACTA's truncation requirements, the "knowing violation" exclusion does not preclude coverage for the *Turner* litigation and acts.

*e. Exclusion for TCPA, CAN–SPAM, Other Statutory Violations*

■ Defendants Essex and USLI further assert that a policy exclusion for violations of the TCPA, CAN–SPAM, and other statutes precludes coverage for E.T. and Creative. Because the policy exclusions invoked by Essex and USLI differ from each other in ways that may be significant, the Court considers each exclusion separately. Endorsement CG 00 67 03 05, which applies to the contract between USLI and Creative, provides, in relevant part,

B. The following exclusion is added to Paragraph 2., Exclusions of Section I—Coverage B—Personal And Advertising Injury Liability:

2. Exclusions

This insurance does not apply to:

DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

\* \* \* \* \*

c. Any statute, ordinance or regulation, other than the TCPA [Telephone Consumer Protection Act] or CAN–SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

D.E. 47–2 at 20. Defendant USLI argues that to the extent that providing a customer with an electronically printed receipt bearing the customer's non-truncated payment card information constitutes a "publication" under the coverage provisions, it must likewise represent a "communicating or distribution of material or information" for purposes of this exclusion. *See* D.E. 18 at 14.

This Court agrees. While this exclusion applies simply to "communicating or distribution of material or information" without the expansive clarifier found in the policy covering "publication, in any manner," the ordinary meaning of "communicating or distribution" includes providing a customer with an electronically printed receipt bearing the customer's payment card information. The reason for this stems from the ordinary meanings of the words "communicating or distribution." According to Merriam–Webster Online, "distribution" means, among other definitions, "the act or process of distributing," or "something distributed: as (1) a sum of money withdrawn from a fund (as a retirement fund) and given to the beneficiary or holder of the fund (2) dividend." www.merriam-webster.com/dictionary/distribution. "Distributing" in turn, is defined, among other ways, as "... giv[ing] out or deliver[ing] especially to members of a group." These definitions demonstrate that although the more common usage of the word "distribution" involves dissemination to a group, the term, nonetheless, also includes the act of providing something to a single person. www.

merriam-webster.com/dictionary/distributing.

Similarly, "communicating" means, among other definitions, "shar[ing]," "... convey[ing] knowledge of or information about: mak[ing] known ..., and caus[ing] to pass from one to another ...." www.merriam-webster.com/dictionary/communicating. Likewise, dictionary.com defines "communication," in relevant part, as "a document or message imparting news, views, information, etc." www.dictionary.reference.com/browse/communication. As these definitions make apparent, they encompass within the definition of "communicating" providing to the customer an electronically printed receipt bearing the card holder's card account information.

Because the FACTA is a statute that limits the information that such an electronically printed receipt provided to the card holder may include, and, indeed, prohibits the inclusion of certain information, the FACTA qualifies as a statute that "prohibits and limits the ... communicating or distribution of material or information," within the ordinary meaning of the terms of this exclusion. As a result, USLI is under neither a duty to defend nor to indemnify Creative with regard to the *Turner* litigation.

Turning to the E.T.-Essex insurance policy, the Court reaches the opposite conclusion. Combination General Endorsement ME–001 (01/07) provides, in pertinent part,

10. This insurance does not apply to 'bodily injury,' 'property damage,' 'personal injury,' 'advertising injury' or any injury, loss, or damages, including consequential injury, loss or damage, arising out of, caused by or contributed to:

j. from any action or omission that violates or is alleged to violate the

Telephone Consumer Protection Act (TCPA), the CAN–SPAM Act of 2003, including any amendment of or addition to such laws, or any analogous local, state or federal statute, ordinance or regulation, other than the foregoing, that prohibits or limits sending, transmitting, communicating, solicitation, or distribution of material or information using e-mails, telephone, telephone facsimile machine, computer or other electronic device....

D.E. 47–3 at 9. Unlike the USLI exclusion, the Essex exclusion limits its own applicability to injury arising from violation of the TCPA, CAN–SPAM, "or any *analogous* ... federal statute...." *Id.* Therefore, the Court must consider whether the FACTA qualifies as a statute that is "analogous" to the TCPA or CAN–SPAM.

"Analogous" is not defined in the insurance policy. Yet the contract construction canon requiring courts to give meaning, if possible, to every term in a contract dictates that the word must add something beyond how the provision would be interpreted in the absence of the word. Consequently, an "analogous ... federal statute" cannot mean *any* federal statute that "prohibits or limits sending, transmitting, communicating, solicitation, or distribution of information ...;" it must mean some subset of that universe. Merriam–Webster Online defines "analogous" as "showing an analogy or a likeness that permits one to draw an analogy." www.merriam-webster. com/dictionary/analogous. "Analogy," in turn, means "a resemblance in some particulars of things otherwise unlike." www. merriam-webster.com/dictionary/analogy. Thus, the exclusion applies to damages caused by violations of federal statutes that are similar to the TCPA and CAN–SPAM.

The Court therefore examines the TCPA and CAN–SPAM for significant ways in which they are similar. As the Eleventh Circuit has noted, the findings accompanying the TCPA legislation explain its purpose, in relevant part, as follows: " 'Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.' " *Hooters,* 157 Fed.Appx. at 206 (quoting Telephone Consumer Protection Act of 1991, Pub. L. No. 102–243, § 2(9), 105 Stat. 2394, 2394). More specifically, Congress commented, "Businesses also have complained to the Congress and the Federal Communications Commission that automated or prerecorded telephone calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce." *Id.* (quoting Telephone Consumer Protection Act of 1991, Pub.L. No. 102–243 at § 2(14)). In other words, Congress was concerned for, among other reasons, the rights of people not to be subjected to certain telemarketing calls (and facsimiles) if they did not wish to be. Thus, the congressional remarks identified above and other similar ones have led courts to conclude that the TCPA protects a "seclusion" privacy interest, or the right to be left alone. *See, e.g., Hooters,* 157 Fed. Appx. at 208; *Park Univ. Ent., Inc. v. Amer. Cas. Co. of Reading,* 442 F.3d 1239, 1249 (10th Cir.2006) ("Courts have consistently held the TCPA protects a species of privacy interest in the sense of seclusion").

Likewise, CAN–SPAM seeks to safeguard a seclusion privacy interest as well. In this respect, the Senate Report accompanying the CAN–SPAM bill described the purposes of the legislation as follows:

The purposes of this legislation are to: (i) prohibit senders of electronic mail (e-mail) for primarily commercial advertisement or promotional purposes from deceiving intended recipients or Internet service providers as to the source or

**1342**

subject matter of their e-mail messages; (ii) require such e-mail senders to give recipients an opportunity to decline to receive future commercial e-mail from them and to honor such requests; (iii) require senders of unsolicited commercial e-mail (UCE) to also include a valid physical address in the e-mail message and a clear notice that the message is an advertisement or solicitation; and (iv) prohibit businesses from knowingly promoting, or permitting the promotion of, their trade or business through e-mail transmitted with false or misleading sender or routing information.

S. Rep. 108–102, at 1 (2003), *reprinted in* 2004 U.S.C.C.A.N. 2348. Among other functions, this statement reflects a significant concern that people should not have to be bothered with receiving commercial e-mails if they do not wish to get them. As with the TCPA, then, which protects people from being showered with unwanted facsimiles and telephone calls, CAN–SPAM also seeks to protect the seclusion privacy interest.

As previously discussed, however, the FACTA seeks to protect the secrecy privacy interest in that it attempts to protect private financial information from becoming known to others. Therefore, the seclusion privacy interest, or the right to avoid intrusions into a private domain, which the TCPA and CAN–SPAM are intended to address, represents a different kind of privacy interest than the secrecy privacy interest at stake in the FACTA. *See Hooters*, 157 Fed.Appx. at 207–08 (distinguishing between "violations of a right to secrecy of personal information [and a right not to have to endure unnecessary] intrusions into a personal domain"); *see also Penzer*, 545 F.3d at 1307–12; *Park Univ. Ent., Inc. v. Amer. Cas. Co. of Reading*, 442 F.3d 1239, 1248 (10th Cir.

2006); *Amer. States Ins. Co. v. Capital Assocs. of Jackson County, Inc.*, 392 F.3d 939, 941 (7th Cir.2004); *Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 640–41 (4th Cir.2005). Because the TCPA and CAN–SPAM address a different type of privacy interest from that protected by the FACTA, the Court concludes that the FACTA does not qualify as a federal statute that is "analogous" to the TCPA and CAN–SPAM. As a result, this exclusion does not preclude coverage under the circumstances of this case.

### III.  Conclusion

For the foregoing reasons, I find that Plaintiff E.T. has sufficiently pled a cause of action against Defendant Essex, but Plaintiff Creative has not stated a viable cause of action against Defendant USLI. Therefore, I respectfully recommend that the Court grant Defendant USLI's Motion to Dismiss [D.E. 18] and deny Defendant Essex's Motion to Dismiss [D.E. 24].

The parties shall have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William J. Zloch, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the district judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (*en banc*);[13] 28 U.S.C. § 636(b)(1).

**13.** Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

FILED AND SUBMITTED at Fort Lauderdale, Florida, this 1st day of September, 2009.